# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHARLES FRANKLIN MURDOCH, JR.,
          *Petitioner-Appellant,*

          v.

ROY CASTRO, Warden; BILL
LOCKYER, Attorney General,
Attorney General of the State of
California,
          *Respondents-Appellees.*

No. 05-55665

D.C. No.
CV 99-06900
RSWL

OPINION

Appeal from the United States District Court
for the Central District of California
Ronald S.W. Lew, District Judge, Presiding

Argued and Submitted
October 26, 2006—Pasadena, California

Filed June 12, 2007

Before: Myron H. Bright,* A. Wallace Tashima, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Tashima;
Dissent by Judge Bright

---

*The Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

7133

## COUNSEL

Seymour I. Amster, Van Nuys, California, for the petitioner-appellant.

Rama R. Maline, Deputy Attorney General, Los Angeles, California, for the respondent-appellee.

## OPINION

TASHIMA, Circuit Judge:

For the second time, Charles Murdoch, a California state prisoner, appeals from the judgment of the district court denying his petition for a writ of habeas corpus. In his previous appeal, we held that the exclusion of a privileged letter could violate a defendant's Sixth Amendment right to confrontation and cross-examination, depending on the content of the letter. *Murdoch v. Castro*, 365 F.3d 699, 705 (9th Cir. 2004) ("*Murdoch I*"). We therefore remanded for the district court to review the letter and to determine whether the attorney-client privilege must yield to the petitioner's right of cross-examination. *Id.* at 706. On remand, after reviewing the letter, the district court held that there was no constitutional violation. We have jurisdiction pursuant to 28 U.S.C. § 2253, and we affirm.

## I. BACKGROUND

On May 17, 1983, four men robbed the Horseshoe Bar in Long Beach, California. In the course of the robbery, one

bystander was shot and killed; another was stabbed and severely wounded. The men recovered approximately $200 from the cash register and left behind a fingerprint. The crime went unsolved until 11 years later, when advances in fingerprint technology enabled police to identify Dino Dinardo as one of the perpetrators.

Officers arrested Dinardo on June 30, 1994, in Berkeley, California. When first questioned, Dinardo denied any involvement in the crime, but later recanted, admitting his involvement in the robbery, and identifying Murdoch as one of his accomplices. Both Dinardo and Murdoch were charged with murder accompanied by special circumstances.

Dinardo was tried first. At a suppression hearing that preceded his trial, Dinardo testified that his confession to the Long Beach police had been coerced, and that he had given the confession in exchange for a promise that he would be released to see his wife and daughter. Dinardo was convicted and was sentenced to 25 years' to life imprisonment. At sentencing, the judge suggested to Dinardo that his sentence could be reduced were he to testify against Murdoch. Dinardo agreed and received in return a reduction of his conviction to voluntary manslaughter and a reduced sentence of 12 years' imprisonment.

Dinardo was a key witness at Murdoch's trial. He testified that, in 1983, Murdoch had approached him "to do a job" and that the two of them, together with two other men, robbed the Horseshoe Bar. According to Dinardo, when they entered the bar, Murdoch carried a .22 caliber rifle and announced loudly, "Don't nobody move. This is a stick-up." Dinardo took this as his cue to empty the cash register. He fumbled with the buttons on the register, heard a gunshot, emptied the register, and ran out the back door, joining the other two men in the getaway car, with Murdoch joining them about a minute later. He recalled seeing Murdoch in possession of the rifle both in the bar and in the car. Dinardo testified that the first time he

learned that someone had been shot in the robbery was the day of his arrest, 11 years after the crime.

During Murdoch's trial, Murdoch's attorney, Dinardo's attorney, the prosecutor, and the presiding judge discussed a letter addressed to Dinardo's former counsel. The letter was first brought to the court's attention by the prosecutor, who indicated that in her interviews of Dinardo, he told her of the existence of a letter in which he, Dinardo, stated that he was coerced by the police into implicating Murdoch in the crime. Dinardo's new counsel asserted the attorney-client privilege and work-product doctrine as grounds for refusing to disclose the letter. The court concluded that Dinardo's letter to his former counsel was protected by the attorney-client privilege and thus could not be used, on cross-examination, to impeach Dinardo.

Although Dinardo was not cross-examined about the letter, Murdoch's counsel succeeded in eliciting testimony that challenged Dinardo's credibility as a witness. Dinardo testified that he had been convicted of the same murder for which Murdoch was now being tried and that by testifying in Murdoch's trial, he would "get out in about five years" rather than 21 or more years. He admitted that when he was initially questioned by the police, he had lied and denied that he had ever been inside the Horseshoe Bar. He admitted that he would have done "whatever it took" to get out of custody and be reunited with his daughter. He also testified to convictions for grand theft in 1982 and petty theft in 1984. On re-direct examination by the prosecutor, Dinardo testified that during the police questioning, he named a "Charles or Chuck" as someone else involved in the crime, but he could not remember the last name. He was shown photographs at the end of the interview, and he identified Murdoch as one of his accomplices. On re-cross, he stated that he had testified in his own trial that his confession had been coerced. He also admitted that, had the fingerprints not identified him as one of the rob-

bers, he would have continued to lie to the police about his involvement.

In addition to Dinardo, other witnesses from the Horeshoe Bar testified and provided in-court identification of Murdoch. The bartender, Dyanne Spence, described looking into Murdoch's eyes down the barrel of a rifle pointed at her face. "He's been scaring me for years," she said. She also testified that she had identified Murdoch at a live lineup at the county jail in 1994 and that she was sure "beyond a shadow of a doubt" that Murdoch had committed the crime.

Murdoch was convicted of first-degree murder with a robbery-murder special circumstance, and sentenced to life imprisonment without parole. The California Court of Appeal affirmed the conviction, and denied Murdoch's petition for a writ of habeas corpus. The California Supreme Court denied Murdoch's petition for review.

Murdoch then filed a federal petition for a writ of habeas corpus, which the district court dismissed. On appeal, we vacated the order denying Murdoch's habaeas petition and remanded the case to the district court stating:

> Today, we address a situation where a substantial showing has been made that, depending upon the content of Dinardo's letter, the Confrontation Clause and attorney-client privilege are potentially at odds — a set of facts the Supreme Court has not yet examined. Its precedents, however, clearly provide that evidentiary privileges or other state laws must yield if necessary to ensure the level of cross-examination demanded by the Sixth Amendment.

*Murdoch I*, 365 F.3d at 702. We concluded that if the contents of Dinardo's letter "are as generally described by the prosecutor and as Murdoch believes," then Murdoch "has arguably met his burden" of showing that the jury might have received

a significantly different impression of the witness' credibility had Murdoch been able to pursue his proposed line of cross examination. *Id.* at 705. General impeachment for bias implicated Dinardo's reliability to a lesser extent than actual statements inconsistent with his testimony, such as those which the letter purportedly contained. *Id.* Without knowing the contents of the letter, however, we could not make a determination of whether Murdoch's confrontation rights had been violated. We accordingly remanded the case to the district court with instructions that the court obtain the letter, inspect it *in camera*, and determine whether the state court's decision to deny Murdoch access to the letter violated Murdoch's Sixth Amendment right of confrontation. *Id.* at 706.

On remand, the magistrate judge, in his report and recommendation, began from the premise that "[e]ssentially, the Ninth Circuit held that the attorney-client privilege might have to yield in a particular case if the right of confrontation would be violated by enforcing the privilege." The report addressed four issues: (1) whether the contents of the letter were examined by the state courts during the petitioner's postconviction proceedings; (2) whether the state courts weighed the probative value of the letter and petitioner's right to confront witnesses against Dinardo's attorney-client privilege; (3) whether weighing the rights at stake would indicate a constitutional violation; and, if so, (4) whether the violation represented harmless error.

Regarding the first two issues, the magistrate judge concluded that although the state courts had read the contents of the letter, their decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," within the meaning of 28 U.S.C. § 2254(d)(1), in that they failed to perform any balancing of Murdoch's Sixth Amendment rights against the privilege.

The report next examined the contents of the letter to determine whether a constitutional violation had occurred. It con-

cluded that the letter's intrinsic probative value was low, given that of the four factual assertions in the letter, "trial testimony rebutted the first three, and half of the fourth." This observation segued into a discussion of Murdoch's rights to cross-examine, which in turn relied on an analysis of the probative value of the letter. The magistrate judge summarized the contents of the letter as asserting the following facts: (1) After Dinardo's arrest in Berkeley, Long Beach Police Detective Pavek coerced a statement from Dinardo by promising not to charge Dinardo in exchange for Dinardo's statement; (2) In his statement, Dinardo was forced to identify petitioner Murdoch as a participant in the crime; (3) Dinardo does not actually know Murdoch, although Dinardo is acquainted with Murdoch's brother; and (4) Murdoch and Dinardo did not commit any crime.

The magistrate judge then summarized trial testimony that rebutted these factual assertions. Because the factual assertions in the letter had been "contradicted by trial testimony" or "were demonstrably false in the light of other testimony," the "intrinsic probative value of the letter was and is low." Thus, the exclusion of the letter from evidence did not substantially diminish Murdoch's right to effective cross-examination. The magistrate judge also concluded that the decision to exclude the letter was subject to harmless error analysis, and, further concluded, under the *Brecht v. Abrahamson* standard, 507 U.S. 619, 637 (1993), that there was no "grave doubt" as to whether the jury would have reached a different result had the letter been admitted. While acknowledging that "Dinardo's testimony was crucial," the magistrate found that "Dinardo's prior inconsistent statement was inextricably linked with other statements which either conflicted with other evidence or were demonstrably false." Therefore, he concluded that any error resulting from the exclusion of the letter was harmless.

The district court adopted the findings and recommendation of the magistrate judge and denied Murdoch's habeas petition.

Murdoch filed a timely notice of appeal. We granted a certificate of appealability on the issue of "whether the district court erred by ruling that the state trial court did not violate the Sixth Amendment right to confrontation when it denied him access to Dinardo's letter."

## II.   STANDARD OF REVIEW

We review de novo the district court's denial of a § 2254 habeas petition. *Insyxiengmay v. Morgan*, 403 F.3d 657, 665 (9th Cir. 2005). Under the Antiterrorism and Effective Death Penalty Act of 1996, a habeas petition challenging a state court conviction will not be granted unless the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## III.   DISCUSSION

As noted, this is the second time we have examined whether California's attorney-client privilege bars Murdoch from seeing or using an exculpatory letter written by the state's witness to his lawyer. The starting point of our analysis is thus the law-of-the-case doctrine, which " 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' " *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). "This rule of practice promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.' " *Id.* (quoting 1B J. Moore, J. Lucas, & T. Currier, Moore's Federal Practice 118 (1984)). "For the doctrine to apply, the issue in question must have been 'decided explicitly or by necessary implication in [the] previous disposition.' " *Milgard Tempering v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir. 1990) (quot-

ing *Liberty Mutual Ins. Co. v. EEOC*, 691 F.2d 438, 441 (9th Cir. 1982)) (alteration in original).[1]

[1] In Murdoch's prior appeal, we held that, under the right set of facts, Supreme Court precedent suggests the Sixth Amendment right to confrontation could support admission of the letter, even against a valid claim of attorney-client privilege. *Murdoch I*, 365 F.3d at 706. We vacated the district court's denial of Murdoch's habeas petition and remanded the case with instructions that the district court review the letter *in camera* to determine "whether, as applied to the totality of facts in this case, the denial of access to Dinardo's letter resulted in an unconstitutional denial of Murdoch's Sixth Amendment right to confront witnesses." *Id.* A necessary implication of our decision — and hence, law of the case — is that the confrontation clause *could* support introduction of the letter as evidence. Otherwise, there would have been no ground upon which to vacate the decision of the district court.[2]

[2] We therefore proceed to the question of whether Murdoch's Sixth Amendment rights were violated by the exclusion of the privileged letter.[3] The Sixth Amendment

---

[1]No party contends that the law of the case does not apply. Thus, we need not inquire whether any exception to that doctrine should apply. *See United States v. Lummi Indian Tribe*, 235 F.3d 443, 452-53 (9th Cir. 2000) (enumerating the exceptions to the doctrine).

[2]Also necessarily implicit in our decision in *Murdoch I* was that Supreme Court precedent had "clearly established," as required by 28 U.S.C. § 2254(d)(1), that under the proper circumstances, shielding a witness' letter to his attorney under the attorney-client privilege could violate a defendant's confrontation rights under the Sixth Amendment. We note that other circuits have arrived at the same conclusion as *Murdoch I* that, under Supreme Court precedent, the attorney-client privilege must sometimes yield to the Sixth Amendment right to confrontation. *See Mills v. Singletary*, 161 F.3d 1273 (11th Cir. 1998); *United States v. Rainone*, 32 F.3d 1203, 1206 (7th Cir. 1994).

[3]Like the panel before us, we are bound by the state court's interpretation of its evidence law — that Dinardo's letter is protected by the attorney-client privilege. *Murdoch I*, 365 F.3d at 703 n.1 (quoting *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991) ("We are not a state supreme court of errors; we do not review questions of state evidence law.")).

guarantees Murdoch the right "to be confronted with the witnesses against him." U.S. CONST. AMEND. VI. "Confrontation means more than being allowed to confront the witness physically. 'Our cases construing the (confrontation) clause hold that a primary interest secured by it is the right of cross-examination.' " *Davis v. Alaska*, 415 U.S. 308, 315 (1974) (quoting *Douglas v. Alabama*, 380 U.S. 415, 418 (1965)).

**[3]** Although Murdoch's attorney cross-examined and re-cross-examined Dinardo, this alone does not resolve whether Murdoch was afforded his right to cross-examination, because "the Confrontation Clause requires that a defendant be given an opportunity for *effective* cross-examination." *Murdoch I*, 365 F.3d at 704 (emphasis added). Effectiveness requires that "the trier of fact [have] a satisfactory basis for evaluating the truth of the prior statement." *California v. Green*, 399 U.S. 149, 161 (1970). "When exploring the credibility of a prosecution witness who testifies against a criminal defendant, it is axiomatic that the defendant may employ the witness's prior inconsistent statements in order to impeach the credibility of the witness." *United States v. Adamson*, 291 F.3d 606, 612 (2002). " 'Wide latitude in cross-examination is especially appropriate when the key witness is an accomplice of the accused.' " *Murdoch I*, 365 F.3d at 704 (quoting *Burr v. Sullivan*, 618 F.2d 583, 587 (9th Cir. 1980)); *see also United States v. Mayans*, 17 F.3d 1174, 1184 (9th Cir. 1994) (the right to cross-examination is " 'especially important with respect to accomplices or other witnesses who may have substantial reason to cooperate with the government' ") (quoting *United States v. Onori*, 535 F.2d 938, 945 (5th Cir. 1976)).

Here, Murdoch's counsel was able, by effective cross-examination, to raise doubts as to Dinardo's biases and motivations. Dinardo testified that his sentence was reduced to "about five years" in exchange for his testimony. He testified about his previous theft convictions, both before and after the robbery in question. He testified to prior inconsistent statements: that at the time of his arrest he initially denied any

involvement in the crime; that he "would have said whatever it took to get out of custody" including "point[ing] out some-one else" involved in the crime; that he pleaded "not guilty" at his own trial and "avoid[ed] responsibility" for the crime; and that his story had changed from earlier claims that the police had coerced his confession. Dinardo equivocated on the stand when confronted with prior inconsistent testimony: "I testified to that? . . . I — I can't remember testifying like that. If I could see it, I could probably remember." In sum, Dinardo's cross-examinations were effective.

[4] The confrontation clause "guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " *United States v. Owens*, 484 U.S. 554, 559 (1988) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987)). " 'A limitation on cross examination does not violate the Confrontation Clause unless it limits relevant testimony and prejudices the defendant, and denies the jury sufficient information to appraise the biases and motivations of the witness.' " *United States v. Bridgeforth*, 441 F.3d 864, 868 (9th Cir. 2006) (quoting *United States v. Holler*, 411 F.3d 1061, 1066 (9th Cir. 2005)). We conclude that here the jury was provided ample information on which to measure Dinardo's biases, particularly given his admission that he earlier denied any involvement on his or Murdoch's part in the crime.

Although we can imagine a letter of such probative value that its exclusion would render cross-examination constitu-tionally defective, Dinardo's letter is not such a letter. We agree with the reasoned analysis of the magistrate judge that the letter is of low probative value. The assertions in the letter run contrary to the testimony of Murdoch's brother, his for-mer roommate, the investigating detective, the eye-witnesses at the crime, and the fingerprints at the crime scene. Although questioning about the letter may have added some marginal benefit to Murdoch's cross-examination, its absence did not

deny the jury sufficient information to appraise the biases and
motivations of the witness.

[5] In light of the low probative value of the letter and the
otherwise effective cross-examination, we hold that Mur-
doch's constitutional right to confrontation did not require the
disclosure of Dinardo's letter to Murdoch's counsel.[4] Accord-
ingly, the district court's denial of Murdoch's petition for a
writ of habeas corpus is **AFFIRMED**.

---

BRIGHT, Circuit Judge, dissenting:

Persuaded by a jury's verdict against him, Dino Dinardo
now admits his role in the robbery of the Horseshoe Bar in
1983 and murder of a bystander. Buoyed by the hope of a
lesser sentence and his professed remorse for his role in the
crime, Dinardo became the state's central witness against
Charles Murdoch. In *Murdoch I* this court concluded that
"[t]he record strongly suggests that without Dinardo's accom-
plice testimony, the prosecution's case against Murdoch was
weak." 365 F.3d 699, 701 (9th Cir. 2004).

We must now determine whether a letter, given by Dinardo
to his counsel before his trial but withheld from Murdoch
because of the attorney-client privilege, would have been so
crucial to Murdoch's effective cross-examination of Dinardo
that the court's failure to disclose it violated Dinardo's Sixth
Amendment right to confrontation. The majority discounts the
value of the letter because it contains the routine and unsub-
stantiated denials of a man charged with a crime and because,
in any event, Dinardo was effectively cross-examined without
it. I reach a different conclusion and therefore respectfully
dissent.

---

[4]Because we hold that Murdoch's Sixth Amendment rights were not
violated, we need not reach the issue of whether a violation would have
constituted harmless error under *Brecht*, 507 U.S. at 637.

## I.

The court in *Murdoch I*, without the benefit of the privileged letter which was then unavailable, resolved a threshold question: it concluded that a criminal defendant's rights under the Sixth Amendment may overcome a third party's assertion of the attorney-client privilege. *See id.* at 706. It also speculated that Dinardo's letter could provide additional impeachment evidence that would render his testimony useless to the state, and thus remanded the case for the district court to obtain and review *in camera* the contents of the letter:

> Other than Dinardo's predictable denial when arrested for his involvement in the crime, the privileged letter is the only evidence of prior (purportedly) inconsistent statements by Dinardo regarding Murdoch's involvement in the robbery and murder. General impeachment for bias based on his plea bargain questioned Dinardo's reliability and trustworthiness in a much different (and lesser) way than would actual statements inconsistent with what he was then saying on the stand. Thus, Murdoch's ability to fully cross examine Dinardo was severely limited by the privilege ruling.

*Murdoch I*, 365 F.3d at 705. We, however, are not limited to engaging in conjecture. The text of the letter is now before us.

Because the attorney-client privilege still shields the letter by virtue of the majority's opinion, I shall not interfere with the privilege by describing the letter's content in any greater detail than the majority or the magistrate judge. It is, however, possible to accurately and almost fully reconstruct the letter from those materials and Dinardo's testimony against Murdoch. I have endeavored to do so here.

Dinardo's letter is dated December 1, 1994, about five months after his arrest on June 29, 1994. The robbery and

murder occurred over eleven years earlier on May 17, 1983. At the time of his arrest and also at the time he wrote the letter, Dinardo knew that a fingerprint found on the Horseshoe Bar's cash register connected him to the crime. His testimony at Murdoch's trial also indicates that, on his initial arrest, he was unaware that the police suspected him of complicity in the murder that occurred during the robbery. Dinardo thought the police had arrested him only for robbery, but learned of the murder charge when he arrived at the jail in Long Beach, California.

This is my reconstruction of the letter that Dinardo sent to his counsel as he awaited trial:

> I would like to make a statement about the facts surrounding my arrest for robbery and murder. I was taking care of my young daughter when Long Beach police arrested me at my home in Berkeley. Two policemen, Detective Pavek and his partner, took me to the Berkeley Police Department and interviewed me. I wanted to get back to my daughter as I worried about her welfare. At that time, Detective Pavek coerced a statement from me and promised not to charge me if I made a statement that Charles Murdoch participated in the crime. But, I do not actually know Mr. Murdoch, although I know his brother. Mr. Murdoch and I did not commit any crime.

I draw particular attention to the final sentence, which I take from the magistrate judge's characterization of the letter: Mr. Murdoch and I "did not commit any crime."

The magistrate judge asserted that this statement is a denial both of Dinardo's participation in the crime and Murdoch's. As such, he continues, it is at least half false because police found Dinardo's fingerprint on the cash register. However, it is clear in the letter that Dinardo does not disavow his own participation in the crime. After all, he knew that he had left

his fingerprint. The sentence serves, at least implicitly, to say that Murdoch was not with Dinardo at the scene of the crime, which written statement directly contradicts Dinardo's trial testimony.

What a boon to Murdoch. After showing Dinardo the letter to refresh his recollection, Murdoch's counsel could have undermined any reliance on his testimony that Murdoch participated in the crime. The majority depicts Dinardo's letter as "run[ning] contrary to" his and others' testimony at Murdoch's trial. I agree, but the truth of Dinardo's statements in the letter is beside the point. Murdoch's counsel was able on cross-examination to show only that Dinardo initially denied his involvement in the crime, made *some* inconsistent statement, and, because he hoped to gain a reduction of his sentence, had an incentive to provide testimony favorable to the state regardless of its truthfulness.

The majority concludes this was sufficient to undermine the jury's confidence in Dinardo but, as this court in *Murdoch I* suggested, general impeachment is inferior to impeachment based on a prior inconsistent statement. *See Murdoch I*, 365 F.3d at 705.

The letter and its disavowal of Murdoch's involvement in the crime would have been the pièce de résistance, leading inextricably to the conclusion that Dinardo was not only generally unreliable but also untrustworthy regarding the one element of his testimony that the jury (as its verdict demonstrates) must have believed.

The concluding question on cross-examination of Dinardo seems obvious: "Were you lying then or are you lying now?" What juror would give credence to any statement of Dinardo? The prosecution's case relying on this lying witness would collapse.

## II.

The remaining evidence, as the court in *Murdoch I* suggested when it remarked that the state's case was otherwise "weak," 365 F.3d at 701, cannot sustain Murdoch's guilt. The evidence consisted primarily of three eyewitness identifications, but each is flawed. Dyanne Spence, a bartender at the Horseshoe Bar, provided the most confident identification after viewing Murdoch in a 1994 live line-up, testifying that he carried the rifle during the robbery "beyond a shadow of a doubt." But, at the time of the crime, she could not positively identify his image in a photographic line-up. Carol Halliburon, a patron of the bar, testified that Murdoch "look[ed] very similar" to the rifle-bearer. Finally, Edward Snow, another patron, equivocated when he testified:

> Q   Do you see anybody in the courtroom today that you saw that night?
>
> A   It's been 13 years. And I can't be positive.
>
> Q   Do you see somebody who looks familiar?
>
> A   I would say the person sitting next to the gentleman here — [Murdoch]

Other testimony demonstrated only a social relationship between Dinardo and Murdoch. Without belief in Dinardo's accomplice testimony, this collection of tenuous identifications is alone insufficient to relegate Murdoch to prison for life without the possibility of parole.

## III.

The value of Dinardo's letter to Murdoch's counsel is unquestionable. Our examination of the letter following the court's remand in *Murdoch I* has borne out the prior court's suspicion. Murdoch may have been able to *generally* impeach

Dinardo without the letter, but the letter would have provided a prior inconsistent statement undermining the heart of his testimony. *See Murdoch I,* 365 F.3d at 705. Its impact would not have been marginal, as the majority concludes, but rather decisive, and therefore the writ of habeas corpus should be granted.