Opinion by Judge TASHIMA; Concurrence by Judge SILVERMAN; Dissent by Judge KOZINSKI; Dissent by Judge THOMAS.
TASHIMA, Circuit Judge:
Charles Murdoch was convicted of murder in California state court. Before trial, the prosecutor informed the court that a prosecution witness’and participant in the crime had written a letter to his attorney claiming that Murdoch was not involved in the crime and that the witness had been coerced into implicating Murdoch. The state court ruled that Murdoch could not have access to the letter because it was protected under California’s attorney-client privilege. In order to determine whether Murdoch is entitled to habeas relief, we must decide whether, under “clearly established Federal law, as determined by the Supreme Court of the United States,” 28 U.S.C. § 2254(d)(1), the Confrontation Clause of the Sixth Amendment of the United States Constitution[1] compelled the release of the letter to Murdoch in spite of the attorney-client privilege.
I. Background[2]
On May 17, 1983, four men robbed the Horseshoe Bar in Long Beach, California. During the course of the robbery, one bystander was shot and killed; another was stabbed and severely wounded. The men recovered approximately $200 from the cash register and left behind a fingerprint. The crime went unsolved until 11 years later, when advances in fingerprint technology enabled police to identify Dino Dinardo as one of the perpetrators.
Officers arrested Dinardo on June 30, 1994, in Berkeley, California. When first questioned, Dinardo denied any involvement in the crime, but later recanted, admitting his involvement in the robbery, and identifying Murdoch as one of his accomplices. Both Dinardo and Murdoch were charged with murder accompanied by special circumstances.
Dinardo was tried first. At a suppression hearing that preceded his trial, Dinar-do testified that his confession to the Long Beach police had been coerced, and that he had given the confession in exchange for a *986 promise that he would be released to see his wife and daughter. Dinardo was convicted and was sentenced to 25 years’ to life imprisonment. At sentencing, the judge said to Dinardo:
I would like to do something different, Mr. Dinardo. You’ve probably been told it’s a set sentence. I have to give it. The only thing I can say is I have 90 days to change the sentence if anything changes in the way of your mind or the District Attorney’s mind insofar as trying to resolve this with something less than the set sentence.
Frankly, from the standpoint of the other trial, unless the District Attorney has something more, I just wonder without your assistance where they’re going; but maybe sometimes cases develop at the last minute. But, to my knowledge, I don’t know of any other evidence. They have a very difficult case without your assistance.
But that’s actually between attorneys, and it’s not the judge’s province.
I was hoping there would be a resolution so that I could sentence you to something less, which I would prefer to do from everything about this case, especially the length of time and all the years that you lived what appears to be a law-abiding life before you got arrested.
Dinardo subsequently did testify and, in return, received a reduction of his conviction to voluntary manslaughter and a reduced sentence of 12 years’ imprisonment.[3]
Dinardo was a key witness at Murdoch’s trial. He testified that, in 1983, Murdoch had approached him “to do a job” and that the two of them, together with two other men, robbed the Horseshoe Bar. According to Dinardo, when Murdoch entered the bar, Murdoch carried a .22 caliber rifle and announced loudly, “Don’t nobody move. This is a stick-up.” Dinardo took this as his cue to empty the cash register. He *987 fumbled with the buttons on the register, heard a gunshot, emptied the register, and ran out the back door, joining the other two men in the getaway car, with Murdoch joining them about a minute later. He recalled seeing Murdoch in possession of the rifle both in the bar and in the car. Dinardo testified that the first time he learned that someone had been shot in the robbery was the day of his arrest, 11 years after the crime.
During Murdoch’s trial, Murdoch’s attorney, Dinardo’s attorney, the prosecutor, and the presiding judge discussed a letter from Dinardo addressed to his then counsel. The letter was first brought to the court’s attention by the prosecutor, who indicated that in her interviews of Dinardo, he told her of the existence of a letter in which he, Dinardo, stated that he was coerced by the police into implicating Murdoch in the crime. Dinardo’s new counsel asserted the attorney-client privilege and work-product doctrine as grounds for refusing to disclose the letter. The court concluded that Dinardo’s letter to Dinar-do’s former counsel, who was still representing Dinardo when the letter was written, was protected by the attorney-client privilege and thus could not be used, on cross-examination, to impeach Dinardo.
Although Dinardo was not cross-examined about the letter, Murdoch’s counsel succeeded in eliciting testimony that challenged Dinardo’s credibility as a witness. Dinardo testified that he had been convicted of the same murder for which Murdoch was now being tried and that by testifying in Murdoch’s trial, he would “get out in about five years” rather than 21 or more years. He admitted that when he was initially questioned by the police, he had lied and denied that he had ever been inside the Horseshoe Bar. He admitted that he would have done “whatever it took” to get out of custody and be reunited with his daughter. He also testified to convictions for grand theft in 1982 and petty theft in 1984. On re-direct examination by the prosecutor, Dinardo testified that during the police questioning, he named a “Charles or Chuck” as someone else involved in the crime, but he could not remember the last name. He was shown photographs at the end of the interview, and he identified Murdoch as one of his accomplices. On re-cross, he stated that he had testified in his own trial that his confession had been coerced. He also admitted that, had the fingerprints not identified him as one of the robbers, he would have continued to lie to the police about his involvement.
In addition to Dinardo, other witnesses from the Horseshoe Bar testified and provided in-court identification of Murdoch. The bartender, Dyanne Spence, described looking into Murdoch’s eyes down the barrel of a rifle pointed at her face. “He’s been scaring me for years,” she said. She also testified that she had identified Murdoch at a live lineup at the county jail in 1994 and that she was sure “beyond a shadow of a doubt” that Murdoch had committed the crime.
Murdoch was convicted of first-degree murder with a robbery-murder special circumstance, and sentenced to life imprisonment without parole. The California Court of Appeal affirmed the conviction, and denied Murdoch’s petition for a writ of habeas corpus. The California Supreme Court denied Murdoch’s petition for review.
Murdoch then filed a federal petition for a writ of habeas corpus, which the district court dismissed. On Murdoch’s first appeal, we vacated the order denying Murdoch’s habeas petition and remanded the case to the district court stating:
Today, we address a situation where a substantial showing has been made that, depending upon the content of Dinardo’s letter, the Confrontation Clause and at *988 torney-client privilege are potentially at odds — a set of facts the Supreme Court has not yet examined. Its precedents, however, clearly provide that evidentiary privileges or other state laws must yield if necessary to ensure the level of cross-examination demanded by the Sixth Amendment.
Murdoch v. Castro, 365 F.3d 699, 702 (9th Cir.2004) (“Murdoch I”). We concluded that if the contents of Dinardo’s letter “are as generally described by the prosecutor and as Murdoch believes,” then Murdoch “has arguably met his burden” of showing that the jury might have received a significantly different impression of the witness’ credibility had Murdoch been able to pursue his proposed line of cross-examination. Id. at 705. General impeachment for bias implicated Dinardo’s reliability to a lesser extent than actual statements inconsistent with his testimony, such as those which the letter purportedly contained. Id. Without knowing the contents of the letter, however, we could not make a determination of whether Murdoch’s confrontation rights had been violated. We accordingly remanded the case to the district court with instructions that the court obtain the letter, inspect it in camera, and determine whether the state court’s decision to deny Murdoch access to the letter violated Murdoch’s Sixth Amendment right of confrontation. Id. at 706.
On remand, the magistrate judge, in his report and recommendation, began from the premise that “[essentially, the Ninth Circuit held that the attorney-client privilege might have to yield in a particular case if the right of confrontation would be violated by enforcing the privilege.” The report concluded that, although the state courts had read the contents of the letter, their decisions were “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,” within the meaning of 28 U.S.C. § 2254(d)(1), in that they failed to perform any balancing of Murdoch’s Sixth Amendment rights against the privilege.
Nevertheless, the report found that there was no constitutional violation because the letter’s intrinsic probative value was low, given that, of the four factual assertions in the letter, “trial testimony rebutted the first three, and half of the fourth.” The magistrate judge summarized the contents of the letter as asserting the following facts: (1) After Dinardo’s arrest in Berkeley, Long Beach Police Detective Pavek coerced a statement from Dinardo by promising not to charge Dinar-do in exchange for Dinardo’s statement; (2) In his statement, Dinardo was forced to identify petitioner Murdoch as a participant in the crime; (3) Dinardo does not actually know Murdoch, although Dinardo is acquainted with Murdoch’s brother; and (4) Murdoch and Dinardo did not commit any crime.
Because the factual assertions in the letter had been “contradicted by trial testimony” or “were demonstrably false in the light of other testimony,” the magistrate judge found that the “intrinsic probative value of the letter was and is low.” Thus, the exclusion of the letter from evidence did not substantially diminish Murdoch’s right to effective cross-examination. The magistrate judge also concluded that the decision to exclude the letter was subject to harmless error analysis, and, further concluded, under the Brecht v. Abrahamson standard, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), that there was no “grave doubt” as to whether the jury would have reached a different result had the letter been admitted. While acknowledging that “Dinardo’s testimony was crucial,” the magistrate judge found that “Dinardo’s prior inconsistent statement was inextricably linked with other statements which either conflicted with other evidence or were demonstrably *989 false.” Therefore, he concluded that any error resulting from the exclusion of the letter was harmless. The district court adopted the magistrate judge’s findings and recommendation and denied Murdoch’s habeas petition.
On Murdoch’s second appeal, a divided three-judge panel affirmed the district court’s denial of habeas relief in Murdoch II, 489 F.3d 1063. The majority pointed out that it was bound under the “law of the case” doctrine by the Murdoch I court’s holding that, “under the right set of facts, Supreme Court precedent suggests the Sixth Amendment right to confrontation could support admission of the letter, even against a valid claim of attorney-client privilege.” Id. at 1068. Athough the Murdoch I court had not explicitly held that it was clearly established under Supreme Court law that the Confrontation Clause might support the introduction of the letter as evidence, the majority in Murdoch II interpreted this as a necessary implication of Murdoch I that was binding on the panel as the law of the case. Id. at 1068 & n. 2. The panel then held that Murdoch was able to cross-examine Dinardo effectively in spite of not having access to the letter, and that therefore the Sixth Amendment did not require that the letter be released to him. Id. at 1069-70.
Judge Bright[4] dissented from the panel’s decision. He believed that access to the letter would have allowed Murdoch to impeach Dinardo’s testimony much more effectively than was possible without the letter, and that, on the basis of Murdoch I, habeas relief should have been granted. Id. at 1070-72 (Bright, J., dissenting).
We granted Murdoch’s petition for rehearing en banc.[5] Murdoch v. Castro, 546 F.3d 1051 (9th Cir.2008).
II. Jurisdiction and Standard of Review
We review de novo the district court’s denial of a § 2254 habeas petition. Tilcock v. Budge, 538 F.3d 1138, 1143 (9th Cir.2008). Under the Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”), a habeas petition challenging a state court conviction will not be granted unless the decision “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1). Here, AEDPA applies because the state court denied Murdoch’s claim “on the merits,” rather than on a procedural or other ground. 28 U.S.C. § 2254(d)(1); see Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir.2004); Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir.2006) (assuming, unless it is otherwise “clear,” that a state court has decided all the issues presented); Hunter v. Aispuro, 982 F.2d 344, 346-48 (9th Cir.1992) (presuming denial of habeas relief is on the merits, not procedural grounds, unless the decision supports the opposite conclusion). Under § 2254(d), we cannot grant the writ unless the state court’s decision (denying Murdoch’s claim) is objectively unreasonable. See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir.2000); Pirtle v. Morgan, 313 F.3d 1160, 1165, 1169 (9th Cir.2002).
III. Discussion
The Confrontation Clause of the Sixth Amendment guarantees a defendant in a criminal case an opportunity for effective cross-examination of the witnesses against him. Delaware v. Van Arsdall, *990 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). In Murdoch I, we implicitly held that it was clearly established by the Supreme Court that this right could, in some circumstances, be violated by the failure to produce a document that was otherwise protected by the attorney-client privilege. 365 F.3d at 706. The three-judge panel in Murdoch II was bound under the “law of the case” doctrine by Murdoch I’s holding. See Murdoch II, 489 F.3d at 1067-68. This restriction, however, does not apply to the en banc court. See Kyocera Corp. v. Prudentialr-Bache Trade Servs., Inc., 341 F.3d 987, 995 (9th Cir.2003) (en banc). The question we must now confront, therefore, is whether Murdoch I was correct in holding that it is clearly established by Supreme Court precedent that the Sixth Amendment right to confrontation in some situations trumps the attorney-client privilege.
A
The Supreme Court has restricted “clearly established Federal law” under § 2254(d)(1) to “ ‘the holdings, as opposed to the dicta, of this Court’s decisions as of the time of the relevant state-court decision.’ ” Carey v. Musladin, 549 U.S. 70, 74, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) (“Musladin II ”) (quoting Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). A state court’s decision is contrary to clearly established law when it either “applies a rule that contradicts the governing law set forth in [the Supreme Court’s] cases” or “confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.” Williams, 529 U.S. at 405-406, 120 S.Ct. 1495. A state court unreasonably applies clearly established law when it “identifies the correct governing legal principle from [the Supreme Court’s] decisions but unreasonably applies that principle to the facts of the prisoner’s case.” Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (quoting Williams, 529 U.S. at 413, 120 S.Ct. 1495). To be an unreasonable application, the state court decision “must be objectively unreasonable,” not just incorrect or erroneous. Id. at 75-76, 123 S.Ct. 1166. Habeas relief for an unreasonable application of law can be “based on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced”. Id. at 76, 123 S.Ct. 1166.[6] Habeas relief for an unreasonable *991 application of law can be “based on an application of a governing legal principle to a set of facts different from those of the case in which the principle was announced.” Id.; accord Panetti v. Quarterman, 551 U.S. 930, 127 S.Ct. 2842, 2858, 168 L.Ed.2d 662 (2007), but only when the principle “clearly extend[s]” to the new set of facts. Wright v. Van Patten, 552 U.S. 120, 128 S.Ct. 743, 745, 169 L.Ed.2d 583 (2008) (per curiam).
A review of the Supreme Court’s recent case law on this subject suggests that, when a state court may draw a principled distinction between the case before it and Supreme Court caselaw, the law is not clearly established for the state-court case. In Musladin II, 549 U.S. at 77, 127 S.Ct. 649, the Supreme Court vacated a decision of this court, Musladin v. Lamarque, 427 F.3d 653, 661 (9th Cir.2005) (“Musladin /”), in which this court held that the state court unreasonably applied clearly established federal law by allowing the victim’s family members, in a murder trial, to wear buttons depicting the victim while in the presence of the jury.
In support of our decision in Miisladin I, we relied primarily on two Supreme Court cases: Estelle v. Williams, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), and Holbrook v. Flynn, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). In Williams, the Court noted that, when a defendant appears before the jury in prison garb, “[t]he defendant’s clothing is so likely to be a continuing influence throughout the trial that ... an unacceptable risk is presented of impermissible factors coming into play.” 425 U.S. at 505, 96 S.Ct. 1691. Thus, a defendant’s right to a fair trial is violated if he is required to appear in the presence of the jury in such attire. Id. at 505-06, 96 S.Ct. 1691. The Court reaffirmed this basic position in Flynn, but held that the presence of extra security personnel in the courtroom during trial did not necessarily violate the defendant’s Sixth and Fourteenth Amendment rights because, unlike the situation described in Williams, it was not “inherently prejudicial.” Flynn, 475 U.S. at 569, 106 S.Ct. 1340. Although the presence of additional security in the courtroom might violate a defendant’s right to a fair trial in a particular case, Flynn’s trial, in which four uniformed state troopers sat silently in the first row of the spectator section, did not present such a case. Id. at 569-72, 106 S.Ct. 1340. In Musladin I, we held that the presence of the victim’s family in the courtroom while wearing buttons was inherently prejudicial, and was an unreasonable application of the test described in Williams and Flynn. Musladin I, 427 F.3d at 658-61.
When the Supreme Court vacated our grant of habeas relief in Musladin I, it pointed out that “[b]oth Williams and Flynn dealt with government-sponsored practices.” Musladin II, 549 U.S. at 75, 127 S.Ct. 649. No Supreme Court case had applied Williams and Flynn to courtroom conduct by private actors, and, because part of the test established in Williams and Flynn asked “whether the [allegedly prejudicial] practices furthered an essential state interest,” it was not clearly established that the test would apply to actions by private actors. Id. at 76, 127 S.Ct. 649. The Court summarized its reasoning as follows:
Given the lack of holdings from this Court regarding the potentially prejudicial effect of spectators’ courtroom conduct of the kind involved here, it cannot be said that the state court “unreasonably] appli[ed] clearly established Federal law.” § 2254(d)(1). No holding of *992 this Court required the California Court of Appeal to apply the test of Williams and Flynn to the spectators’ conduct here.
Therefore, the state court’s decision-was not contrary to or an unreasonable application of clearly established federal law.
Id. at 77, 127 S.Ct. 649 (emendations in original).
Similarly, in Van Patten, the Court held that it was not clearly established that a defendant received ineffective assistance of counsel if his lawyer represented him via speaker-phone, rather than by being physically present in the courtroom. 128 S.Ct. at 746-47. The Seventh Circuit had granted habeas relief on the basis of United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), which held that in certain circumstances a defendant need not prove that he was actually prejudiced by his attorney’s conduct. The logic of Cronic is that, in some situations, “the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.” Id. at 659-60, 104 S.Ct. 2039. One situation in which Cronic applies is when “counsel[is] either totally absent, or prevented from assisting the accused during a critical stage of the proceeding.” Id. at 659 n. 25, 104 S.Ct. 2039. The Court reversed the Seventh Circuit because Cronic did not clearly apply to the facts at hand. Van Patten, 128 S.Ct. at 746. Although an attorney who participated in a hearing telephonically might not do as well as one who was physically present in the courtroom, the state court could reasonably believe that the attorney’s performance would not be so poor as to justify relief without showing prejudice: “Our cases provide no categorical answer to this question.” Id.
In Panetti, 551 U.S. 930, 127 S.Ct. 2842, by contrast, there was no principled way to apply the Court’s precedent to a somewhat new factual situation and reach the state court’s result; thus, the Court granted habeas relief. Panetti concerned the pending execution of person with a history of mental illness. 127 S.Ct. at 2848-49. The Court identified the controlling legal principle as the holding of Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), which required that a prisoner who has made “a substantial threshold showing of insanity” be given a competency hearing before being subject to execution. Id. at 426, 106 S.Ct. 2595 (Powell, J., concurring in part and concurring in the judgment).[7] The Court held that it was clearly established that Ford required a competency hearing with procedural protections for the prisoner, even though the standard in Ford was stated in general terms and the facts were not identical to those with which it was now faced. Panetti, 127 S.Ct. at 2858-59. There was no reasonable way to apply Ford that would not reach this result, and thus the state court had unreasonably applied the law when it failed to provide Panetti with a proper competency hearing. Id. at 2858.
The common thread in all these cases is that when there is a principled reason for the state court to distinguish between the case before it and Supreme Court precedent, the state court’s decision will not be an unreasonable application of clearly established Supreme Court law. As we stated in Moses v. Payne, 555 F.3d 742 (9th Cir.2009):
[Wjhen a Supreme Court decision does not “squarely. address[] the issue in th[e] case” or establish a legal principle *993 that “clearly extend[s]” to a new context to the extent required by the Supreme Court in these recent decisions, it cannot be said, under AEDPA, there is “clearly established” Supreme Court precedent addressing the issue before us, and so we must defer to the state court’s decision.
Id. at 754 (emendations in original) (quoting Van Patten, 128 S.Ct. at 746, 745).
B
The Supreme Court has examined the potential conflicts between the Confrontation Clause and other rights and privileges, including the marital privilege, Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004),[8] the Fifth Amendment privilege against self-incrimination, Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), and the state’s interest in the confidentiality of adjudications of juvenile delinquency, Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). But no Supreme Court case has directly addressed the potential conflict between state-law attorney-client privilege and the Confrontation Clause, as we acknowledged in Murdoch I. 365 F.3d at 702 (“Today, we address a situation where a substantial showing has been made that, depending upon the content of Dinardo’s letter, the Confrontation Clause and attorney-client privilege are potentially at odds — a set of facts the Supreme Court has not yet examined.”) (emphasis added). Indeed, in a case involving the attorney-client privilege, the Supreme Court has expressly stated that it would not consider the question whether the attorney-client privilege might yield in the face of constitutional rights. Sividler & Berlin v. United States, 524 U.S. 399, 408 n. 3, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998).
In Swidler, the Supreme Court addressed the scope of the attorney-client privilege — specifically, “the extent to which the privilege survives the death of the client.” Id. at 403, 118 S.Ct. 2081. The Independent Counsel sought notes taken by an attorney during a meeting with his client, former Deputy White House Counsel Vincent Foster. Foster sought legal representation, but, shortly after the meeting, he committed suicide. Id. at 401-02, 118 S.Ct. 2081. The Independent Counsel argued that “the attorney-client privilege should not prevent disclosure of confidential communications where the client has died and the information is relevant to a criminal proceeding.” Id. at 403,118 S.Ct. 2081.
The Court began by discussing the purpose of the privilege, “to encourage ‘full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.’ ” Id. (quoting Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)). The Independent Counsel analogized the situation to the testamentary exception to the attorney-client privilege, arguing that “in criminal proceedings, the interest in determining whether a crime has been committed should trump client confidentiality.” Id. at 406, 118 S.Ct. 2081. The Court disagreed, stating that, unlike with the testamentary exception, “[t]here is no reason to suppose as a general matter that grand jury testimony about confidential communications furthers the client’s intent.” Id. As perti *994 nent here, the Court further reasoned that “there is no case authority for the proposition that the privilege applies differently in criminal and civil cases.” Id. at 408-09, 118 S.Ct. 2081. Significantly, the Court noted that, “Petitioners, while opposing wholesale abrogation of the privilege in criminal cases, concede that exceptional circumstances implicating a criminal defendant’s constitutional rights might warrant breaching the privilege,” but the Court stated that “[w]e do not ... need to reach this issue, since such exceptional circumstances clearly are not presented here.” Id. at 408 n. 3, 118 S.Ct. 2081 (emphasis added).
The Supreme Court accordingly has explicitly stated that it was not deciding whether the attorney-client privilege might have to yield to a criminal defendant’s constitutional rights. We have held that a constitutional principle is not clearly established for purposes of § 2254 where the Supreme Court has expressly concluded that an issue is an “open question.” Earp v. Ornoski, 431 F.3d 1158, 1185 (9th Cir. 2005); see also Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir.2008) (holding that the Supreme Court had not clearly established, for purposes of § 2254, that the admission of propensity evidence in that case was unconstitutional because the Supreme Court had expressed no opinion on the issue and the petitioner accordingly could “point to no Supreme Court precedent” establishing the constitutional right); Larson v. Palmateer, 515 F.3d 1057, 1066 (9th Cir.2008) (“Because the Court has expressly left this issue an open question, the state court did not unreasonably apply clearly established federal law in determining that the admission of evidence of Larson’s criminal history did not violate due process.” (internal quotation marks omitted)).
The Eighth Circuit has relied on the Supreme Court’s express reservation of the issue in Swidler to hold that the issue is not clearly established for purposes of § 2254. In Newton v. Kemna, 354 F.3d 776 (8th Cir.2004), the state trial court denied the defendant’s motion to produce the only eyewitness’ medical records. The Eighth Circuit “note[d] that the Supreme Court has recognized in other circumstances that constitutional rights can trump evidentiary privileges,” citing Davis and Swidler. Id. at 781. The court stated, however, that Swidler “expressly left open the question of whether a criminal defendant’s constitutional rights might overcome the attorney-client privilege,” and therefore concluded that the Supreme Court had not clearly established whether a state’s “physician-patient privilege must give way to a defendant’s desire to use psychiatric records in cross-examination.” Id. at 781, 782; see also Johnson v. Norris, 537 F.3d 840, 846-47 (8th Cir.2008) (discussing Newton and Swidler and concluding that, although Davis and Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), “establish that in at least some circumstances, an accused’s constitutional rights are paramount to a State’s interest in protecting confidential information,” those cases “do not establish a specific legal rule that answers whether a State’s psychotherapist-patient privilege must yield to an accused’s desire to use confidential information in defense of a criminal case”). As the Eighth Circuit reasoned in Newton, “[g]iven the restrictive nature of habeas review, it is not our province to speculate as to whether the Supreme Court, if faced with the issue, would find that [a state’s] physician-patient privilege must give way to a defendant’s desire to use [privileged material] in cross-examination.” Newton, 354 F.3d at 782.
It is not mere formalism to distinguish between attorney-client privilege and other rights and privileges the Court *995 has dealt with in its Confrontation Clause jurisprudence. The attorney-client privilege is, after all, “one of the oldest recognized privileges for confidential communications,” Swidler, 524 U.S. at 403, 118 S.Ct. 2081. The Supreme Court might well decide that it is worthy of greater protection than the marital privilege, see Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, or the confidentiality of juvenile delinquency proceedings, see Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347. In addition, the Court might be more likely to protect documents subject to attorney-client privilege because it is easier to maintain such protection without eliminating the defendant’s ability effectively to cross-examine a witness. Because the attorney-client privilege protects only a communication between an attorney and a client, not the facts that are communicated, a defendant would remain free to question the witness about the underlying facts, just as happened here. Despite not having access to the letter, Murdoch was able to cross-examine Dinardo on a wide range of subjects, including Dinardo’s earlier denial of involvement in the murder. As the Supreme Court has explained, the attorney-client privilege does not “create a broad ‘zone of silence’ over” the subject matter of the communication. “The privilege only protects disclosure of [the] communications [themselves]; it does not protect disclosure of the underlying facts,” so long as the underlying facts can be proven without resort to the privileged materials. Upjohn, 449 U.S. at 395, 101 S.Ct. 677.
In Crawford, by contrast, the marital privilege prevented the defendant from cross-examining the witness at all. See 541 U.S. at 40, 124 S.Ct. 1354. The same was true in Douglas v. Alabama, 380 U.S. at 416-17, 85 S.Ct. 1074, when the witness asserted his Fifth Amendment privilege against self-incrimination.
We acknowledge the possibility that the Supreme Court may in the future well decide that the Confrontation Clause in some cases requires the disclosure of documents that are subject to the attorney-client privilege. But under the highly deferential standard established by AEDPA and the Supreme Court, as long as the state court could have found a principled reason not to apply the Court’s precedents to the current case, we may not grant habeas relief. As was the case in Musladin II, 549 U.S. at 77, 127 S.Ct. 649, “[n]o holding of th[e Supreme] Court required the California Court of Appeal to apply” eases such as Douglas and Davis to Murdoch. The relationship between the Confrontation Clause and the attorney-client privilege has not been clearly established by the Supreme Court; as a result, we cannot say that the California court unreasonably applied clearly established Supreme Court law to Murdoch’s case.[9]
IV. Conclusion
Because the Supreme Court has not clearly established whether and in what *996 circumstances the attorney-client privilege must give way in order to protect a defendant’s Sixth Amendment confrontation rights, the California state court could not have unreasonably applied clearly established Supreme Court law when it denied Murdoch access to the letter. See Musladin II, 549 U.S. at 77, 127 S.Ct. 649. To the extent that it holds to the contrary, Murdoch I is overruled. For the reasons set forth above, the judgment of the district court is AFFIRMED.

. "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” U.S. CONST, amend. VI.

. The factual and procedural summary is taken largely from Murdoch v. Castro, 489 F.3d 1063, 1064-67 (9th Cir.2007) (“Murdoch II’’).

. The dissent states that "[flor a judge to goad someone he’s just given a life sentence into helping the prosecution by promising to give him his life back, but only if he helps finger the defendant, is judicial extortion.” Diss. op. at 997. What the Chief Judge harshly labels as "judicial extortion” has long been a part of our criminal justice system. See, e.g., U.S.S.G. § 5K1.1 (providing for a downward sentencing departure for substantial assistance in the prosecution of another person); 18 U.S.C. § 3553(f)(5) (providing that a "safety harbor” sentence below a statutory minimum is available only if, inter alia, the sentencing court finds that the defendant has fully cooperated with the Government). Perhaps the most famous example of such judicial "goading” or "extortion” is that of Chief Judge Sirica in the Watergate trial. There, as reported by Time magazine in its 1973 man-of-the-year story, Judge Sirica "kept the pressure on the other convicted conspirators to talk too by giving them harsh provisional sentences ranging up to 40 years.... He promised to review the sentences later and said that the final sentencing ‘would depend on your full cooperation with the grand jury and the Senate Select Committee.’ ” Available at http://www.time.com/subscriber/personofthe year/archive/stories/ 973.html (last visited May 15, 2010).
The dissent characterizes Judge Sirica’s conduct of the Watergate trial as "unconscionable” and "a blemish on the reputation of the federal courts____” Diss. op. at 997 n.*. The D.C. Circuit, sitting en banc, however, did not express the same, harsh view. It not only affirmed Judge Sirica's conduct, but lauded it in the face of charges that he conducted the trial and sentencing in an inquisitorial manner. See United States v. McCord, 509 F.2d 334, 347 (D.C.Cir.1974) (en banc) ("The judge, like the prosecutor in this respect, is not a passive by-stander in the arena of justice, a spectator at a 'sporting event,’ rather he or she has the most pressing affirmative responsibility to see that justice is done in every case.” (footnotes omitted)), cert. denied, 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975); see also United States v. Liddy, 509 F.2d 428, 442 (D.C.Cir.1974) ("Judge Sirica's palpable search for truth in such a trial was not only permissible, it was in the highest tradition of his office as a federal judge.”).

. The Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation, was a member of the Murdoch II panel.

. The en banc court ordered supplemental briefing on the question of whether the court should reconsider its decision in Murdoch I.

. The California Court of Appeal, which rendered the last reasoned state court decision in this case, addressed Murdoch's Confrontation Clause argument only obliquely. It did not mention the Confrontation Clause in its opinion, but it did discuss and quote from the section of Murdoch’s brief in which he raised the issue. The court also quoted from People v. Godlewski, 17 Cal.App.4th 940, 21 Cal. Rptr.2d 796, 800 (1993), a case that dealt with the tension between the attorney-client privilege and the Confrontation Clause. Whether the state court adequately responded to Murdoch’s Confrontation Clause argument, however, is irrelevant. Even when there is no reasoned state court opinion explaining the denial of a defendant’s claim in any respect, we “must assume that the state court has decided all the issues and 'perform an independent review of the record to ascertain whether the state court decision was objectively reasonable.’ ” Reynoso, 462 F.3d at 1109 (quoting Pham v. Terhune, 400 F.3d 740, 742 (9th Cir.2005) (per curiam)) (internal quotation marks omitted). Thus we do not review Murdoch's claim de novo, as we would if the state court had clearly indicated that it had not reached the merits of Murdoch’s claim. See id.; Pirtle, 313 F.3d at 1167.
The dissent refuses to accept these established principles of AEDPA review. Instead, it spends several pages discussing the state appellate court’s duty under slate law to "analyze[] ... [each] contention” and convinces itself that the state court erroneously '‘declined] to reach [the] issue” and “overlooked” it. See Diss. op. at 999-1001. But *991 whether we review a claim de novo under the AEDPA is a question of federal law and, on that question, as explained above, we are bound by Reynoso and Pirtle.

. Because Justice Powell's opinion represented the narrowest ground on which five Justices agreed, the Panetti court recognized it as the controlling opinion. 127 S.Ct. at 2856.

. Crawford was decided after Murdoch's conviction became final and does not apply retroactively on collateral review. See Whorton v. Bockting, 549 U.S. 406, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007). Thus, whether the Supreme Court in Crawford explained "what the Sixth Amendment was supposed to prevent,” Diss. op. at 1002, is irrelevant to our review under the AEDPA.

. The concurrence faults Murdoch because his counsel "only sought disclosure of the letter Dinardo had written to his lawyer,” and did not move to strike Dinardo's testimony. Concur, op. at 996. It assumes that the exclusive procedure for preserving a Sixth Amendment confrontation claim is a motion to strike the challenged testimony, but cites no case so holding. Instead, the authorities on which Judge Silverman relies state only what is "ordinarily ... appropriate,” or that a defendant is "entitled” to have the testimony stricken, or what “many judges ... agree.” Id. at 996. Because Judge Silverman agrees that Murdoch "unquestionably perfected his objection to the court’s denial of the disclosure request,” id. at 996, we agree with Chief Judge Kozinski that, because "California is satisfied with the procedural posture of this case,[w]e are in no position to disagree.” Diss. op. at 1009.