**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TARA SHENEVA WILLIAMS,
            *Petitioner-Appellant,*

v.

JAVIER CAVAZOS, Acting Warden of
the Central California Women's
Facility in Chowchilla, California,
            *Respondent-Appellee.*

No. 07-56127

D.C. No.
CV-03-02691-GW

OPINION

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted
August 2, 2010—Pasadena, California

Filed May 23, 2011

Before: Alex Kozinski, Chief Judge, Stephen Reinhardt,
Circuit Judge, and Ronald M. Whyte,
Senior District Judge.*

Opinion by Judge Reinhardt

---

*The Honorable Ronald M. Whyte, United States District Judge for the Northern District of California, sitting by designation.

## COUNSEL

Kurt David Hermansen, San Diego, California, for the petitioner-appellant.

Stephanie C. Brenan, Deputy Attorney General, Los Angeles, California, for the respondent-appellee.

**OPINION**

REINHARDT, Circuit Judge:

Consider two scenes:

*Scene One*

Juror #8:   I just want to talk.

Juror #7:   Well, what's there to talk about? Eleven men in here think he's guilty. No one had to think twice about it except you.

Juror #10:   I want to ask you something: do you believe his story?

Juror #8:   I don't know whether I believe it or not — maybe I don't.

Juror #7:   So how come you vote not guilty?

Juror #8:   Well, there were eleven votes for guilty. It's not easy to raise my hand and send a boy off to die without talking about it first. . . . We're talking about somebody's life here. We can't decide in five minutes. Supposin' we're wrong.

*Scene Two*

Juror #6:   I said . . . this is a very important case and we should be very convinced that if the defendant is found guilty that it is beyond a reasonable doubt. . . .

Foreman:   We have spent some time now trying to understand the reasonable basis for his

> doubt, and I personally did not yet understand it . . . . I would say that two-thirds of the jurors have tried to persuade — have actively tried to persuade . . . him that his current view is incorrect. . . .

Juror #4: Well, I guess he believes from the evidence that he's seen that there hasn't been sufficient proof. . . .

Juror #5: I think the question may have been raised: "Do you have a political agenda?" I think [it] might have been in the heat of the argument, because it does get heated back and forth from a bunch of different people. It may have been said. . . .

Juror #9: Well, he said this is a serious thing, and I don't really feel that there is enough cause for — or something to that effect. . . . What he said was, "I wouldn't want to take anyone's freedom away, unless," you know, "I was sure that certain things took place." . . . .

The first passage above is dialogue from the classic Academy Award-winning 1957 film, *Twelve Angry Men*, in which Henry Fonda plays a holdout juror who, over two tense hours, convinces his eleven peers that the defendant in a murder trial should be acquitted. The second excerpt comes from the transcript of proceedings during the petitioner's murder trial, in which each juror was examined and cross-examined, *seriatim* and mid-deliberation, after it was reported that one juror was taking a different view from the others. In the end, the trial court dismissed that juror on the ground that he was "biased"

against the prosecution. With an alternate juror in place, the jury returned a guilty verdict.

*Twelve Angry Men* made for great drama because it violated the sanctity of the jury's secret deliberations by allowing the audience into the jury room. It was, of course, a work of fiction. We are presented here with a similar intrusion into heated deliberations involving a holdout juror, except that this one took place in open court, and it resulted in a woman being convicted and sentenced to life imprisonment after the holdout was dismissed. Under the precedent that existed when petitioner's conviction became final (and exists today as well), the trial court's actions violated the petitioner's Sixth Amendment rights, as incorporated with respect to the states under the Fourteenth Amendment. We therefore conclude that petitioner is in custody in violation of the Constitution, reverse the judgment of the district court, and remand with instructions to grant the writ.

## I. BACKGROUND

### A. The Offense

One afternoon in October 1993, petitioner Tara Sheneva Williams agreed to drive around two friends, Carde Taylor and Schantel W., to case out stores for a potential robbery later that night. The third or fourth store they visited was a liquor store, which Taylor and Schantel entered while Williams waited in the car. The two emerged a few seconds later, but then Taylor went back in, pointed a gun at the proprietor and, in the course of emptying the cash register, shot and killed him. After being arrested in 1998 and initially denying knowledge of the crime, Taylor and Williams both admitted to being present and that Taylor had killed the owner. Williams told the police that, while she knew Taylor was armed, there had never been a plan to rob the store during daylight hours.

Taylor and Williams were each charged with special circumstances murder and a firearm enhancement, and they were tried separately. After a five-day jury trial, Williams was found guilty of murder with special circumstances as charged and the firearm enhancement. The jury found that a handgun was used in the commission of the crime. She was later sentenced to life imprisonment without the possibility of parole.[1]

## B.   The Jury Deliberations

Williams was convicted only after the trial court dismissed a known holdout juror and replaced him with an alternate. This dismissal, and the events leading up to it, form the basis of her claim for habeas relief.

Two days after the jurors began deliberations, the jury foreman delivered two notes to the trial court. The first read:

Relative to jury instruction 17.[41].1,[2] I wish to

---

[1]Taylor was convicted as well, and sentenced to a life term without the possibility of parole, plus five years.

[2]That instruction is California's anti-jury nullification instruction, which states:

The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on [penalty or punishment, or] any [other] improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation.

California Jury Instructions — Criminal, CALJIC No. 17.41.1 (1998 New) (6th ed. 1996) (brackets in original). The Supreme Court of California has since barred the use of this instruction, "believ[ing] [it to] ha[ve] the potential to intrude unnecessarily on the deliberative process and affect it adversely — both with respect to the freedom of jurors to express their differing views during deliberations, and the proper receptivity they should accord the views of their fellow jurors." *People v. Engelman*, 28 Cal. 4th 436, 440 (2002). The trial court's use of this instruction is not at issue here.

inform you that we have one juror who: 1) has expressed an intention to disregard the law . . . and 2) has expressed concern relative to the severity of the charge (1st degree murder).

The second asked:

Is it legally permissible for a juror to interpret page 32 of the jury instructions to mean that the conspiracy should involve a plan to commit a specific robbery, rather than a general plan to commit robberies in the future?

The trial court called the jury into the courtroom and informed its members that the answer to the second question was "no." All the jurors except for the foreman were asked to leave, and the court proceeded to question him regarding the first note.

## 1.  Jury Foreman (Juror No. 8)

The foreman first confirmed that no juror had "expressed any concern about punishment or the punishment that one might expect to flow from a certain conviction," which the jury had been expressly instructed it could not do. When asked what was meant by the phrase "has expressed concern relative to the severity of the charge," the foreman answered that the juror in question "has probably ten or fifteen times in our conversations so far expressed that . . . he doesn't believe that there's sufficient evidence —." At this point, the court interrupted the foreman and informed him that he could not speak to "how jurors view the evidence" but could only express concern with whether there was "misconduct." As an example of misconduct, the court described a situation where a juror "says something like, I can't convict anybody of first degree murder because of the punishment or something like that, or I had a cousin in a similar situation, and I wouldn't want the person here to suffer what, you know, my cousin went through, something like that." The foreman then

responded: "I think it's halfway to that, and so I think that one's a little iffy, and I think your answer to the first part may be sufficient to resolve our concern at this time."

Upon the People's motion, and over Williams's objection, the court halted jury deliberations and questioned the foreman again the next day. According to the foreman, on the first day of deliberations, Juror No. 6 had brought up historical instances "when juries have refused to follow the law," such as in pre-Civil War prosecutions for harboring fugitive slaves and during the Vietnam War era for burning draft cards. The foreman expressed his opinion that Juror No. 6 had "a belief . . . that [there] is a civic responsibility to — there's a name for this — civil disobedience. There's a responsibility to be disobedient in that case." However, the foreman testified that when he had asked Juror No. 6 explicitly "if that's what was going on here," the juror answered "no."

The foreman testified that Juror No. 6 had expressed his view that first degree murder was a severe charge which affected the "way he interprets the evidence and the standard he uses for doubt." Juror No. 6, according to the foreman, had made a "fairly clear statement . . . that connects the severity of the charge with — explicitly of first degree murder with his need for a higher standard." The foreman conceded that Juror No. 6 had not explicitly expressed an unwillingness to follow the law or the jury instructions on the standard of proof. He also agreed that the juror had attempted to explain "the basis for his reasonable doubt" to the other jurors many times and had actively engaged in "intellectual conversation with them, listening to their questions, trying to answer them."

## 2.   Juror No. 6

The court called in Juror No. 6 for questioning. Juror No. 6 testified that no juror had indicated being motivated by the issue of possible punishment in the case, and that no juror had even used the word "punishment." He denied using a higher

burden of proof based on the severity of the first degree murder charge, and stated, "I think that the same burden of proof should be used for any criminal offense, higher than a civil trial, but all criminal trials should have — whether it's first degree murder or not should have the same burden of proof." He recalled the court's instruction regarding what constituted proof beyond a reasonable doubt, and testified that he agreed to follow it as he understood it. He expressed his understanding of the instruction as: "not proof — there's always some possible doubt in any human affair, but if you have a reasonable doubt based on the evidence and only on the evidence that was presented at trial, if you have a reasonable doubt about a defendant's guilt, under the law, you are required to vote not guilty."

The prosecutor asked, "Has anyone discussed the severity of the charge?" Juror No. 6 responded, "No, not that I recall." The court then interjected, "Just to be clear, have you made reference during deliberations to the severity of the charge?" And Juror No. 6 replied, "No, I — Well, let me amend that. I said I can remember saying this is a very important case and we should be very convinced that if the defendant is found guilty that it is beyond a reasonable doubt. Other than that, I did not make a reference to the severity of the case — the severity of the charge."

The court asked Juror No. 6 about the difference between proving a criminal charge under the standard of "beyond a reasonable doubt" and proving the same charge under the standard of "very convinced beyond a reasonable doubt." Juror No. 6 began to answer "No, they're the same standards as far as —" when the court cut him off, asking, "What does 'very convinced' add?" Juror No. 6 responded, "It just means . . . it's a good idea to pay particular attention to what evidence was presented at the trial and make sure before we decide on a verdict, that we are convinced — if the verdict is guilty, that we are convinced beyond a reasonable doubt by the evidence that was presented at the trial." He then stated a

second time that "convinced beyond a reasonable doubt is the standard, and I don't think that there is a difference between convinced beyond a reasonable doubt and very convinced beyond a reasonable doubt. I think it's the same thing."

Juror No. 6 also expressed his view that "jurors should not use juror nullification." He stated, "They should base their decisions on the evidence that was presented at a particular trial and only on that evidence." Juror No. 6 was later asked again whether the jurors had discussed jury nullification. He responded that another juror had "raised the question whether juries always convict according to the law," and that he had responded, "sometimes they don't," and had shared his knowledge of historical cases in which the law "was not always enforced" and "became impossible to enforce, because juries would not convict people who were clearly in violation of it."

After Juror No. 6 was excused, the prosecutor asked the court to remove him. The court stated that it was "inclined to rule that the juror has engaged in misconduct. He's applying a higher burden of proof than the law requires . . . and . . . he isn't lying, but intentionally withheld honest information." The court noted that Juror No. 6 had "contradicted himself," because he initially answered that no juror had discussed juror nullification or the seriousness of the charge, but later admitted that he had responded to a juror's question about jurors not following the law. But the court decided to first question the other jurors about Juror No. 6, in order to develop a "fuller record."

### 3.   The Other Ten Jurors

Over the next two hours, the trial judge, prosecutor, and defense counsel questioned each of the remaining jurors, one by one. Six jurors (Nos. 3, 5, 7, 10, 11, and 12) stated that, in their opinion, Juror No. 6 was not following the law. When questioned further, however, four of those six (Nos. 5, 7, 11,

and 12) acknowledged that Juror No. 6 had never said as much, but two (Nos. 3 and 10) reported that Juror No. 6 had said, "in essence," that he would not follow the law. The other four (Nos. 1, 2, 4, and 9) thought that Juror No. 6 was following the law, and, in the words of Juror No. 2, was "being honest." Those jurors thought there was just a difference in opinion over how the law applied to the facts of the case. Juror No. 9, for example, explained that Juror No. 6 had tried to explain his view, "but none of us really understood it the way he did." Only five jurors (Nos. 1, 2, 5, 7, and 11) mentioned jury nullification at all, of which just one (No. 2) thought Juror No. 6 might actually be engaging in the practice. Additionally, two jurors (Nos. 2 and 5) made comments to the effect that Juror No. 6 disapproved of the theory of accomplice liability. Six jurors (Nos. 2, 3, 4, 9, 10, and 11) explained that Juror No. 6 did not believe that the evidence was sufficient to prove guilt of murder beyond a reasonable doubt.

## 4.  The Trial Court Decision

After the inquiry concluded, the court dismissed Juror No. 6 under California Penal Code section 1089, which provides for the discharge of jurors for good cause.[3] The court ruled that its dismissal of Juror No. 6 was "not because he's not deliberating and not because he's not following the law."

---

[3]In relevant part, the statute reads:

> If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, *or upon other good cause shown to the court is found to be unable to perform his or her duty*, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors.

Cal. Penal Code § 1089 (emphasis added).

Instead, "he is dismissed without any question in my mind as a biased juror," because "his mind is bent . . . against the prosecution," as evidenced by his statements concerning the government's burden of proof, his disagreement with the felony-murder rule, and his "dishonest[y]" in recounting whether anyone had discussed the severity of the charge or juror nullification. The court then concluded that Juror No. 6 "was lying in court" and "has no business being a juror in this matter," and so dismissed him.

## C.   Subsequent Proceedings

An alternate juror replaced Juror No. 6 immediately. The following day, the jury returned a guilty verdict against Williams for first degree murder. Williams appealed, claiming that the trial court had both abused its discretion in applying section 1089 and violated her Sixth Amendment rights. The California Court of Appeal affirmed her conviction on the state-law ground, but did not address her Sixth Amendment claim at all. The Supreme Court of California then granted review, ordered the Court of Appeal decision vacated, and remanded the case for reconsideration in light of its recent decision, *People v. Cleveland*, 21 P.3d 1225 (Cal. 2001).

On remand, the Court of Appeal issued a slightly modified version of its prior opinion and again affirmed Williams's conviction. The Court of Appeal reiterated that the trial court "discharg[ed] Juror No. 6 because he had shown himself to be biased, *not* because he was failing to deliberate or engaging in juror nullification." Again, the court did not address her Sixth Amendment challenge. The Supreme Court of California denied Williams's second petition for review without comment, over Justice Kennard's dissent. Her conviction became final on July 9, 2002, when the time to petition the United States Supreme Court for a writ of certiorari expired.

Williams then sought relief in federal court.[4] The district court denied the petition, and Williams timely appealed.

## II. STANDARD OF REVIEW

Williams filed her federal habeas petition in 2003, so it is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA). Under AEDPA, federal courts may grant habeas relief to a state prisoner "with respect to any claim that was adjudicated on the merits in State court proceedings" only if that adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). To determine whether we apply "AEDPA deference" here, we must consider which state court "decision" we review, and whether that decision actually "adjudicated" Williams's Sixth Amendment claim on the merits.

### A

It has long been the practice of federal habeas courts to "look through" summary denials of claims by state appellate courts and review instead the last reasoned state-court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991); *see, e.g.*, *Kennedy v. Lockyer*, 379 F.3d 1041, 1052 (9th Cir. 2004). Following the Supreme Court's decision in *Harrington v. Richter*, 131 S. Ct. 770 (2011), we continue to adhere to that practice, at least with respect to cases in which state courts of

---

[4]Williams's initial *pro se* petition was stayed pending exhaustion of state post-conviction remedies. Both the Court of Appeal and the Supreme Court of California denied her state habeas petitions on the ground that her claim concerning juror discharge had already been decided on direct appeal.

last resort have exercised their discretionary authority to deny petitions for review. In *Richter*, the Court held that summary denials of *original* petitions for habeas corpus filed in the Supreme Court of California should "be presumed" to be "adjudicated . . . on the merits." *Id.* at 784-785. The question in *Richter* arose because state habeas petitions in California are presented to the state supreme court as original petitions, rather than as requests for review of lower-court rulings denying relief; accordingly, the Supreme Court of California must actually adjudicate each habeas petition. Noting that "the California Supreme Court disposes of . . . more than 3,400 original habeas corpus petitioner" each year, the *Richter* Court observed that "[t]he issuance of summary dispositions in many collateral attack cases can enable a state judiciary to concentrate its resources on the cases where opinions are most needed." *Id.* at 784. It thus determined that the summary nature of the court's disposition of its thousands of original habeas petitions in no way undermines any presumption that they are decisions on the merits. *Id.* at 784-785.

A state court's decision to deny *discretionary* review is entirely different. On direct appeal of a decision by a state court of appeal in a non-capital case, the Supreme Court of California has the authority to choose whether or not to grant review. *See* Cal. R. Ct. 8.500. As when the United States Supreme Court denies a petition for certiorari, the California high court's decision to deny a petition for review is not a decision on the merits, but rather means no more than that the court has decided not to consider the case on the merits. *See, e.g.*, *Campers v. Workers' Comp. Appeals Bd.*, 836 P.2d 888, 894 n.8 (Cal. 1992) ("[W]e reiterate the well-established rule in this state that a denial of a petition for review is not an expression of opinion of the Supreme Court on the merits of the case."); *see also People v. Davis*, 81 P. 718 (Cal. 1905) ("The significance of such refusal [by the Supreme Court to accept a case for review] is no greater than this — that this court does not consider that the interests of justice, or the purposes for which the power [to transfer cases for review] was

given, require its exercise in the particular case."). That is, under California law, the state supreme court's discretionary denial of a petition for review is decidedly not a decision on the merits. *Cf. Richter*, 131 S. Ct. at 785. Accordingly, in this case, the Supreme Court of California's denial of Williams's second petition for review — seeking review of the California Court of Appeal opinion issued on remand from the Supreme Court of California — was not a decision on the merits. We therefore continue to "look through" the state supreme court's denial of discretionary review to the last reasoned state court decision, which here is the second California Court of Appeal opinion on Williams's direct appeal.

## B

We must next consider whether the Court of Appeal adjudicated Williams's Sixth Amendment claim on the merits. We conclude that it did not.

Most of the time, any claim a federal habeas court is able to consider on the merits will first have been "adjudicated on the merits in State court proceedings," and thus the strictures of § 2254(d) apply. That is so because the most common reason a claim would *not* have been adjudicated on the merits — it was never raised in state court — is itself a bar to federal habeas review. *See* 28 U.S.C. § 2254(b)(1)(A) (requiring exhaustion). Occasionally, however, a federal habeas petitioner brings a claim that *was* raised in state court but *was not* decided on its merits — because, for example, the claim was dismissed on a procedural ground that itself is inadequate to bar federal review, there was no need to address the claim in light of a precursor holding, or, as here, the court simply failed to decide the claim without explanation.[5] In such cases,

---

[5]That no decision on the merits was issued is, of course, no indication itself of a failure to exhaust; "[i]t is too obvious to merit extended discussion that whether the exhaustion requirement of 28 U.S.C. § 2254(b) has been satisfied cannot turn upon whether a state appellate court chooses to ignore in its opinion a federal constitutional claim squarely raised in petitioner's brief in the state court." *Smith v. Digmon*, 434 U.S. 332, 333 (1978) (per curiam).

when it is clear that the "[state] courts did not reach the merits of [the petitioner's constitutional] claim, federal habeas review is not subject to the deferential standard that applies under AEDPA to 'any claim that was adjudicated on the merits in State court proceedings' "; "[i]nstead, the claim is reviewed de novo." *Cone v. Bell*, 129 S. Ct. 1769, 1784 (2009) (quoting 28 U.S.C. § 2254(d)).[6]

---

[6]*See also Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (because state court never reached "prejudice" prong of ineffective assistance of counsel claim, that issue was reviewed de novo); *Wiggins v. Smith*, 539 U.S. 510, 534 (2005) (same); *Nulph v. Cook*, 333 F.3d 1052, 1056-1057 (9th Cir. 2003) (state court dismissed state habeas petition for failing to state a claim under Oregon habeas law, so "AEDPA's deferential standard . . . does not apply in this case because the state court did not reach the merits of Nulph's due process claim"); *Taylor v. Bowersox*, 329 F.3d 963, 968 (8th Cir. 2003) (de novo review because claim was not decided on the merits by the state court, which had dismissed the claim as having been previously litigated); *Pirtle v. Morgan*, 313 F.3d 1160, 1165, 1167 (9th Cir. 2002) (state court declined to adjudicate claim on state post-conviction review under its "relitigation rule," although the issue had not actually been raised on direct review, so federal habeas court reviewed claim de novo); *Norde v. Keane*, 294 F.3d 401, 410 (2d Cir. 2002) ("Here, the Appellate Division's opinion on direct review addressed only Norde's arguments that the evidence relating to the physical injury was insufficient, that the prosecutor was improperly allowed to make prejudicial remarks during summation, and that the prosecutor's inquiry into Norde's prior convictions was prejudicial. The court did not mention Norde's Sixth Amendment claims, and the opinion does not contain any language, general or specific, indicating that those claims were considered and denied on the merits. . . . Because the Appellate Division never indicated in any way that it had considered Norde's Sixth Amendment claims, we find that those claims were not adjudicated on the merits, and therefore that the AEDPA's new, more deferential standard of review does not apply." (internal citation omitted)); *Appel v. Horn*, 250 F.3d 203, 210-211 (3d Cir. 2001) (de novo review after state supreme court had wrongly "recharacterized" petitioner's constructive-denial-of-counsel claim as an ineffective-assistance-of-counsel claim, and as a result "failed to adjudicate [the] denial of counsel claim on the merits"); *Weeks v. Angelone*, 176 F.3d 249, 262-263 (4th Cir. 1999) (de novo review when state supreme court "failed to address" a properly raised claim); *Fisher v. Texas*, 169 F.3d 295, 300-302 (5th Cir. 1999) (de novo review when state court had dismissed claim on procedural grounds, not merits, and state then failed to assert the

De novo review in these infrequent circumstances is consistent with "the basic structure of federal habeas jurisdiction," which is "designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." *Richter*, 131 S. Ct. at 787. When those "principal forum[s]" are provided the opportunity to adjudicate constitutional challenges but fail to do so, whether intentionally or inadvertently, the only remaining forum — the federal courts — must do so in the first instance. Habeas review under such circumstances neither "frustrates . . . [the States'] good-faith attempts to honor constitutional rights" — for the State has made no attempt to do so — nor "disturbs the State's significant interest in repose for concluded litigation" — since an issue in the litigation was left unconcluded. *Id.* (internal quotation marks omitted).

This is one of those rare cases in which a claim was properly raised and yet was not decided by the state court.[7] Before

procedural default in federal habeas litigation); *Moore v. Parke*, 148 F.3d 705, 708-710 (7th Cir. 1998) (de novo review when state decision was based on procedural error that was not an "adequate" state ground for the decision).

[7]Counsel for the State acknowledged at oral argument that nothing in the Court of Appeal decision suggests that the court considered the Sixth Amendment argument. Audio recording of oral argument at 27:21 to 29:30:

Reinhardt, J:  Where in its decision did the Court of Appeal decide the question of whether there was a Sixth Amendment violation?

Deputy A.G.:  What we're looking at is they were applying what was California law. The 1089, I believe, of the Penal Code, and saying that California state court properly applied that. I think that, specifically they didn't get into a Sixth Amendment question, but if you look at, for our purposes, what we have are really no U.S. Supreme Court authority that would govern this particular type of situation . . . .

Kozinski, C.J.:  That was a very long answer. . . . It wasn't a good answer; it was just a long answer. I take it the answer is

the Court of Appeal, Williams made two arguments relevant to the issue now before us. First, citing numerous state court decisions construing section 1089, she argued that the trial court abused the discretion accorded to it by that statute to dismiss jurors for cause. Pet'r Cal. Ct. App. Br. 7-8. Second, she presented her constitutional claim by arguing that the "remov[al] and replace[ment]" of a holdout juror from "a jury which had previously been deadlocked" violated her rights under the Sixth Amendment. Pet'r Cal. Ct. App. Br. 9; *see also id.* at 41-42.[8]

---

"no" to Judge Reinhardt's question. The Court of Appeal did not discuss the Sixth Amendment. . . . Is there anything more than "no" by way of an answer to the question Judge Reinhardt asked?

Deputy A.G.: "No" would answer it.

Kozinski, C.J.: It is not discussed. The Court of Appeal does not discuss the Sixth Amendment.

Deputy A.G.: The Court of Appeal does not discuss the Sixth Amendment. Correct.

[8] Specifically, Williams relied upon *Perez v. Marshall*, 119 F.3d 1422 (9th Cir. 1997), which recognized that the "Sixth Amendment right to a jury trial" could be offended by "the dismissal and replacement of . . . jurors" under section 1089 in some circumstances, although there was no violation on the facts of that case. Pet'r Cal. Ct. App. Br. 41-42 (citing *id.* at 1426). The substance of Williams's federal claim was just that: Because "Juror No. 6 was a holdout juror for acquittal" who "questioned the sufficiency of the People's evidence to prove appellant's guilt beyond a reasonable doubt," the court "denied [Williams] her Sixth Amendment right" by dismissing him. Pet'r Cal. Ct. App. Br. 41. Moreover, citing federal cases, Williams argued that in this case the "questioning [of all jurors] was a severe intrusion onto the secrecy of the jury's deliberations to the extent it elicited their subjective thought processes during those deliberations," which violates an "essential" constitutional feature of the "proper functioning of juries." Pet'r Cal. Ct. App. Br. 14-15 & n.12. Williams also asserted that Juror No. 6's discharge violated her right to a unanimous jury verdict. Pet'r Cal. Ct. App. Br. 9; *see also id.* at 41-42. Although there is no *federal* right to jury unanimity in state court, *see Apocada v. Oregon*, 406 U.S. 404, 412 (1972), California does provide such a right, *see People v. Feagley*, 14 Cal. 3d 338, 350 n.10 (1975), and Williams's argument was

The Court of Appeal proceeded to adjudicate only her section 1089 claim, but not her constitutional claim. It held that the trial court did not abuse its discretion under section 1089, because sufficient evidence supported the trial court's finding that Juror No. 6 met the definition of "actual bias" under the statute. It did not consider, however, whether the removal of the known holdout juror violated the Sixth Amendment.[9]

To be sure, a state court may adjudicate the merits of a constitutional claim without citing federal precedent, and such a decision would be entitled to AEDPA deference. *See, e.g.*, *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). And under *Richter*, even "when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied," we must "presume[ ] that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." 131 S. Ct. at 784-785. Here, however, the Court of Appeal's decision was *not* "unaccompanied by an opinion explaining the reasons relief has been denied," *id.* at 784; rather the court provided a lengthy, reasoned explanation for its denial of Williams's appeal, but none of those reasons addressed her Sixth Amendment claim in any fashion, even indirectly.[10]

---

that the Sixth Amendment does not allow a juror whose vote is essential to the verdict to be removed because he is known to be in favor of the defendant, whatever the vote required to convict. In California, which requires jury unanimity, the removal of even a lone holdout juror violates that right to a fair trial by jury.

[9]In reviewing the trial court's exercise of discretion under section 1089, the court did quote a California Supreme Court case's discussion of the federal constitutional principle of impartiality. The section 1089 issue was distinct from Williams's constitutional claim: that the removal of Juror No. 6 violated her right to a fair trial by jury.

[10]In contrast, in *Murdoch v. Castro*, 609 F.3d 983 (9th Cir. 2010) (en banc), a plurality of the en banc court determined that the California Court of Appeal had "discuss[ed] and quote[d] from the section of [the petitioner's] brief in which he raised" his federal constitutional claim and had

It is obvious, not "theoretical" or "speculat[ive]," that Williams's constitutional claim was not adjudicated at all, and so the *Richter* presumption is overcome. *Id.* at 785. Specifically, the portion of the court's opinion concerning the discharge of Juror No. 6 reveals that the court upheld his dismissal on the sole basis that the trial court had not abused its discretion in applying section 1089. That the court engaged in an extended discussion of Williams's *statutory* claim, but made no mention whatsoever of her more fundamental *constitutional* claim, is a compelling "indication" that the court either overlooked or disregarded her Sixth Amendment claim entirely, rather than that it adjudicated the claim but offered no explanation at all for its decision. *Cf. id.* at 785. Put differently, when a court simply says "claims denied," and nothing more, we presume the denial is on the merits and as to all claims, *see id.* at 784-785, but when a court devotes many pages to explaining its reason for denying one claim, and then says absolutely nothing that even acknowledges the existence of a second claim, "there is reason to think" that it "is more likely" that the court simply neglected the issue and failed to adjudicate the claim.[11]

cited a state case that discussed the federal constitutional right. It therefore stated that the state court had adjudicated the petitioner's constitutional claim on the merits, even though it "addressed [the] argument only obliquely." *Id.* at 990 n.6 (plurality opinion). Unlike in *Murdoch*, here the state court did not address Williams's claim, obliquely or otherwise, and there is not a scintilla of evidence that the Court of Appeal decided the constitutional claim, in addition to a separate claim that it discussed at length. The *Murdoch* court found an "indication" that the state court *had* adjudicated the constitutional claim on the merits; here, the total disparity between the court's treatment in the opinion of Williams's statutory claim (reasoned in detail) and her constitutional claim (not mentioned at all) provides a strong "indication" that the claim was never adjudicated on the merits.

[11]Our "reason to think some other explanation for the state court's decision is more likely" comes in part from common sense and our own experience as sometimes-fallible judges. *Id.* When we write thorough 29-page decisions as the state court did here, yet completely fail to address a partic-

Even then, the Court of Appeal's decision might be entitled to deference if adjudicating the section 1089 claim necessarily entailed adjudicating the Sixth Amendment claim. That would be the case if, for example, California had ever defined the limit of "discretion" to discharge a juror to be at, or short of, the Sixth Amendment boundary. Were that so, a Court of Appeal finding that the trial court had not abused its discretion under section 1089 might implicitly be a determination that the Sixth Amendment had not been violated, and we might be required to consider that Williams's Sixth Amendment claim had been adjudicated on the merits. *Cf. Baker v. Blaine*, 221 F.3d 1108, 1112 (9th Cir. 2000) ("The state court decisions to which the district court gave deference either cited directly to opinions of the Supreme Court of the United States or to cases which themselves rested on Supreme Court precedent, and the state court holdings were consistent with the reasoning of the cited cases," so AEDPA deference should apply).

California does not appear to have considered, however, how the federal constitution constrains a trial court's discretion to discharge a juror from deliberations, so the *Baker* approach to recognizing indirect state determinations of federal constitutional claims does not apply.[12] *Cleveland* was not

---

ular issue, even in an oblique, tangential, or summary manner, it is most often because we so focused on the remainder of the opinion that we overlooked the issue we did not mention directly or indirectly. Just as we occasionally make mistakes and overlook an argument raised on appeal, so too do our state-court peers. It is most unlikely that the state court methodically analyzed each issue presented on appeal except one, a substantial claim of the violation of a federal constitutional right, which it chose to deny on the merits without saying a word.

[12]By contrast, California *has* considered constitutional limitations in restricting a trial court's discretion to instruct a jury once an alternate juror has been added to the group. Citing constitutional concerns, *People v. Collins*, 552 P.2d 742 (Cal. 1976), held that a trial court must direct the jury to disregard past deliberations and begin anew when an alternate juror joins. *Id.* at 745-747.

a constitutional decision; rather, the California Supreme Court defined the limits of a trial court's discretion to conduct evidentiary hearings into juror misconduct, and to dismiss jurors for good cause under section 1089, based on various "policy considerations" and its precedent interpreting section 1089.[13] 21 P.3d at 1231. In so doing, the court expressly *rejected* the juror-discharge standard adopted by the Second, Ninth, and D.C. Circuits. *See* 21 P.3d at 1236-1237 (declining to adopt, among others, *United States v. Symington*, 195 F.3d 1080 (9th Cir. 1999), in favor of a more permissive standard). So it is entirely possible that a juror discharge under section 1089 that is permissible under *Cleveland* could nonetheless violate the Sixth Amendment. Indeed, Justice Werdegar wrote separately in *Cleveland* to raise the concern that a trial court might not abuse its discretion but nonetheless "trench upon a defendant's right to trial by jury" — a concern that the majority did not meet with any response. *Cleveland*, 21 P.3d at 1239 (Werdegar, J., concurring) (internal quotation marks omitted). The Court of Appeal's determination that the trial court did not abuse its discretion under section 1089 thus did not resolve Williams's Sixth Amendment claim, even indirectly.

Instead, we are presented with a case more like the one considered by the Third Circuit in *Hameen v. Delaware*, 212 F.3d 226 (3d Cir. 2000). The petitioner in that case alleged that the "double counting" of an aggravating circumstance in the penalty phase of his capital murder trial resulted in an Eighth Amendment violation. *Id.* at 246-247. In its opinion, the Delaware Supreme Court decided that the challenged aggravating factor did not constitute impermissible double-counting under Delaware's death penalty statute, but it did not

---

[13]In this respect, *Cleveland* was a California equivalent of *Brasfield v. United States*, 272 U.S. 448 (1926) or *Jenkins v. United States*, 380 U.S. 445 (1965) (per curiam), cases in which the Supreme Court set limits on district courts' interference with jury deliberations pursuant to its supervisory power, rather than the Constitution. *See Lowenfield v. Phelps*, 484 U.S. 231, 239-240 & n.2 (1988).

decide his Eighth Amendment claim, apparently believing its death penalty statute to be facially constitutional. *Ferguson v. State*, 642 A.2d 772, 781-783 (Del. 1994); *see Hameen*, 212 F.3d at 247. Reviewing that decision, the Third Circuit determined that the Delaware Supreme Court "did not pass on Ferguson's Eighth Amendment constitutional duplicative aggravating circumstances argument, even though it had the opportunity to do so." *Hameen*, 212 F.3d at 248. Accordingly, with no state decision on the merits to which to apply AEDPA deference, it reviewed de novo. *Id.* Other courts have faced similar situations. *See, e.g.*, *Lyell v. Renico*, 470 F.3d 1177, 1182 (6th Cir. 2006); *Canaan v. McBride*, 395 F.3d 376, 382-383 (7th Cir. 2005); *Norde*, 294 F.3d at 410; *Weeks*, 176 F.3d at 262-263.

As in *Hameen*, the Court of Appeal here conducted a purely statutory analysis of whether the trial court had properly exercised its discretion under section 1089, a statute that was known to be facially constitutional. *See Miller v. Stagner*, 757 F.2d 988 (9th Cir.), *amended on other grounds*, 768 F.2d 1090 (9th Cir. 1985). But a determination that the trial court did not apply section 1089 erroneously as a matter of state law did not resolve Williams's federal claim: that section 1089 *as applied* in her case violated the Sixth Amendment, a claim that the State acknowledges the Court of Appeal did not decide. *See supra* at 6715-16 n.7. Absent a state court adjudication of that claim on the merits, we must review the claim de novo here.

## C

One other potential bar to considering Williams's Sixth Amendment claim merits only brief discussion. The pre-AEDPA standards that govern this case include the Supreme Court's decision in *Teague v. Lane*, 489 U.S. 288 (1989), which limits the constitutional claims that may be presented to a federal court sitting in habeas to exclude those "new rule-[s]" that were announced after the defendant's conviction

became final, with certain exceptions. *Id.* at 301 (plurality opinion). Because "the AEDPA and *Teague* inquiries are distinct," the Supreme Court has directed that "in addition to performing any analysis required by AEDPA, a federal court considering a habeas petition must conduct a threshold *Teague* analysis when the issue is properly raised by the state." *Horn v. Banks*, 536 U.S. 266, 272 (2002) (per curiam). A *Teague* claim may be waived by the State, however, and so we need not consider *Teague* where, as here, the state does not raise it. *See Caspari v. Bohlen*, 510 U.S. 383, 389 (1994). We note, in any event, that Williams does not seek retroactive application of a "new rule" of constitutional law, but rather relies upon cases that were decided years before her conviction became final in 2002, namely *United States v. Symington*, 195 F.3d 1080 (9th Cir. 1999), and *United States v. Brown*, 823 F.2d 591 (D.C. Cir. 1987).[14] Thus, even if a *Teague* issue were properly raised, it would not affect our review.

---

[14]Because AEDPA's deferential standard of review does not apply, Williams is not limited to presenting violations of federal law that was "clearly established . . . as determined by the Supreme Court of the United States" at the time her conviction became final. 28 U.S.C. § 2254(d)(1). Rather, under *Teague* she may also rely upon law that had been established by the federal courts of appeals when her conviction became final. *See Bell v. Hill*, 190 F.3d 1089, 1091-1092 (9th Cir. 1999) (finding no *Teague* problem "despite the fact that Bell bases his Sixth Amendment claim specifically on Ninth Circuit precedent rather than Supreme Court precedent"); *see also Terry Williams v. Taylor*, 529 U.S. 362, 412 (2000) (O'Connor, J., for the Court) ("With one caveat, whatever would qualify as an old rule under our *Teague* jurisprudence will constitute 'clearly established Federal law, as determined by the Supreme Court of the United States' under § 2254(d)(1). The one caveat, as the statutory language makes clear, is that § 2254(d)(1) restricts the source of clearly established law to this Court's jurisprudence.") (citations omitted); *id.* at 381 (Stevens, J., joined by Souter, Ginsburg, and Breyer, JJ.) ("[Section 2254(d)(1)] extends the principle of *Teague* by limiting the source of doctrine on which a federal court may rely in addressing the application for a writ.") (internal quotation marks omitted). Of course, where *Teague* is not raised the courts are free simply to apply the Constitution de novo.

### III. THE MERITS

We turn, at last, to the merits of Williams's claim. Williams argues that the trial court violated her Sixth Amendment right to a fair trial by dismissing a juror who was known to be the lone holdout for acquittal. Reviewing her claim de novo, we agree, for two reasons: (1) there was a reasonable possibility that the request for the juror's discharge stemmed from his views of the merits of the case, and (2) the grounds on which the court relied did not amount to "good cause" to remove a known holdout juror, and thus violated the Sixth Amendment. Accordingly, we reverse.

### A

As a general matter, the Sixth Amendment does not prohibit the mid-deliberation dismissal of jurors who are unable to serve or who engage in misconduct. In *Miller*, for example, we found no constitutional violation in the dismissal of two jurors after deliberations had begun: one of whom was sick with the flu, and another who had been intoxicated the previous morning and had fallen asleep during the rereading of testimony. 757 F.2d at 995. To the contrary, we held that the "California substitution procedure followed by the trial court" — Penal Code section 1089 — was constitutional because it "preserved the 'essential feature' of the jury required by the Sixth and Fourteenth Amendments." *Id.* (quoting *Williams v. Florida*, 399 U.S. 78, 100 (1970)). It appears that every court to have considered the question agrees that some mid-deliberation substitutions are permissible under the federal Constitution.[15]

---

[15]*See, e.g.*, *Claudio v. Snyder*, 68 F.3d 1573, 1577 (3d Cir. 1995) (juror illness); *Peek v. Kemp*, 784 F.2d 1479, 1483-1484 (11th Cir. 1986) (en banc) (emotional distress and physical illness); *United States v. Hillard*, 701 F.2d 1052, 1057 (2d Cir. 1983) (illness); *United States v. Phillips*, 664 F.2d 971, 992-993 (5th Cir. Unit B 1981) (heart attack); *Henderson v. Lane*, 613 F.2d 175, 178-179 (7th Cir. 1980) (heart attack); *see also Com-*

**[1]** It is just as clear, however, that the Sixth Amendment does not allow a trial judge to discharge a juror on account of his views of the merits of the case. In *Duncan v. Louisiana*, 391 U.S. 145 (1968), which incorporated the Sixth Amendment with respect to the states, the Supreme Court explained,

> Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor *and against the compliant, biased, or eccentric judge*. If the defendant preferred the common-sense

*monwealth v. Carnes*, 933 N.E.2d 598, 614-615 (Mass. 2010) (upon discovering juror's material misrepresentations on juror questionnaire). Such unanimity is perhaps surprising given that this rule is in derogation of the jury practice at common law, which was "to discharge the entire panel and begin de novo by forming a new jury" when "a juror has become incapacitated by illness or death after the jury is impaneled and sworn in chief." *People v. Peete*, 202 P. 51, 65 (Cal. Ct. App. 1921); *see also West v. State*, 28 So. 430, 431 (Fla. 1900); *State v. Hasledahl*, 52 N.W. 315, 316 (N.D. 1892).

Some states, however, prohibit juror substitutions after the case has been submitted to the jury under state law. *See, e.g.*, *Claudio v. State*, 585 A.2d 1278, 1301 (Del. 1991) (state constitution); *Crossland v. Commonwealth*, 291 S.W.3d 223, 230 (Ky. 2009) (by rule); *Hayes v. State*, 735 A.2d 1109, 1120 (Md. 1999) (by rule); *State v. Dushame*, 616 A.2d 469, 472 (N.H. 1992) (by statute); *State v. Sanchez*, 6 P.3d 486, 494 (N.M. 2000) (by rule); *People v. Ortiz*, 705 N.E.2d 1199, 1199 (N.Y. 1998) (by rule, forbidding substitutions except upon the defendant's in-court, written consent); *State v. Bobo*, 814 S.W.2d 353, 356 (Tenn. 1991) (state constitution). California, of course, is not among them. *See* Cal. Penal Code § 1089.

judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it. Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power —a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges.

*Id.* at 156 (emphasis added).

The Court later elaborated, "the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from *that group*'s determination of guilt or innocence." *Williams*, 399 U.S. at 100 (emphasis added). The jury is the only actor permitted to determine guilt — not the judge. It is well-established, of course, that "a judge may not direct a verdict of guilty no matter how conclusive the evidence" in a criminal case. *United Bhd. of Carpenters & Joinders of Am. v. United States*, 330 U.S. 395, 408 (1947). It would similarly vitiate the "essential" role of a jury to act as a "safeguard" against both the power of the state and the court for a judge to selectively dismiss jurors based on the views of the merits of the case they express during deliberations. Such dismissals are thus prohibited as well, because a court cannot "do indirectly that which it has no power to do directly." *Sparf v. United States*, 156 U.S. 51, 106 (1895).

**[2]** Indeed, no one, including the judge, is even supposed to be *aware* of the views of individual jurors during deliberations, because a jury's independence is best guaranteed by secret deliberations, such that jurors may "return a verdict freely according to their conscience" and their "conduct in the jury room [may be] untrammeled by the fear of embarrassing publicity." *Clark v. United States*, 289 U.S. 1, 16 (1933). As Justice Cardozo wrote, "Freedom of debate might be stifled

and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world." *Id.* at 13. To be sure, maintaining the secrecy of deliberations might limit a court's ability to investigate alleged misconduct. Nevertheless, as the Second Circuit has explained,

> Where the duty and authority to prevent defiant disregard of the law or evidence comes into conflict with the principle of secret jury deliberations, we are compelled to err in favor of the lesser of two evils — protecting the secrecy of jury deliberations at the expense of possibly allowing irresponsible juror activity. Achieving a more perfect system for monitoring the conduct of jurors in the intense environment of a jury deliberation room entails an unacceptable breach of the secrecy that is essential to the work of juries in the American system of justice. To open the door to the deliberation room any more widely and provide opportunities for broadranging judicial inquisitions into the thought processes of jurors would, in our view, destroy the jury system itself.

*United States v. Thomas*, 116 F.3d 606, 623 (2d Cir. 1997).

Accordingly, in deciding whether to discharge a juror middeliberation, the critical Sixth Amendment questions are whether, after an appropriately limited inquiry, it can be said that there is no reasonable possibility that the juror's discharge stems from his views of the merits, and whether the grounds on which the trial court relied are valid and constitutional. If the answer to either question is no, the removal of the juror violates the Sixth Amendment. We will discuss the two questions separately.

## B

In cases such as *Miller* involving juror illness or intoxication, it is obvious that the basis for discharge is independent

of the juror's views of the merits. Indeed, in *Miller*, the views of the dismissed jurors were not even known. 757 F.2d at 995. Other cases have presented more uncertain circumstances. In *Perez v. Marshall*, 119 F.3d 1422 (9th Cir. 1997), a habeas petitioner claimed a violation of his Sixth Amendment rights when a known holdout juror was dismissed for good cause under section 1089. At an *in camera* hearing, the juror, a twenty-year-old woman, "told the judge that she was distressed and that she did not want the responsibility of deciding whether Perez was guilty," and requested to be dismissed. *Id.* at 1424. Over the prosecution's objection, the court denied the request and encouraged her to continue deliberating. Shortly after deliberations resumed, the foreperson reported "difficulties in the jury room," and the court suspended deliberations again. *Id.* The juror said she was not "emotionally able to continue deliberations," *id.* at 1428, and the jury foreperson confirmed that "it started to be a very emotional thing with the jurors where basically no one could try to make an intelligent decision when you're dealing with somebody that's basically in pieces," *id.* at 1425. The next morning, the court dismissed the juror on the basis that "she is just emotionally out of control." *Id.* Deferring to the "trial court's findings regarding juror fitness," we found no Sixth Amendment violation in the replacement of that juror after her repeated requests to be dismissed. *Id.* at 1426. Because "the record shows that the [trial] court was forced to act, *not* because of [the juror]'s status as a holdout juror, but because of [her] emotional inability to continue performing the essential function of a juror — deliberation," we accepted the state court's decision. *Id.* at 1427 (emphasis added); *accord id.* at 1428 ("[B]ecause there is *no evidence* to suggest that the trial court's decision was motivated by [the juror]'s views on the merits of the government's case, we affirm the . . . denial of habeas relief." (emphasis added)).

In *United States v. Brown*, 823 F.2d 591 (D.C. Cir. 1987), by contrast, the D.C. Circuit held unconstitutional the dismissal of a juror who requested to be discharged after five

weeks of deliberations. The juror told the court that "the prob-
lem" he had was "the way the R.I.C.O. conspiracy act reads.
. . . If I had known at the beginning of this trial what the act
said, I would have not said I could be impartial." *Id.* at 594.
He acknowledged that he "disagree[d] with the law," but did
not say he would refuse to follow it. Rather, he stated, "If the
evidence was presented in a fashion in which the law is writ-
ten, then, maybe, I would be able to discharge my duties." *Id.*
Reviewing this episode, the D.C. Circuit held that "a court
may not dismiss a juror during deliberations if the request for
discharge stems from doubts the juror harbors about the suffi-
ciency of the government's evidence." *Id.* at 596. "A dis-
charge of this kind," the court explained, "would enable the
government to obtain a conviction even though a member of
the jury that began deliberations thought that the government
had failed to prove its case. Such a result is unacceptable
under the Constitution." *Id.* Recognizing that "the reasons
underlying a request for a dismissal will often be unclear,"
and that "a court may not delve deeply into a juror's motiva-
tions because it may not intrude on the secrecy of the jury's
deliberations," the court held that "if the record evidence dis-
closes any possibility that the request to discharge stems from
the juror's view of the sufficiency of the government's evi-
dence, the court must deny the request." *Id.* Because there
was a "substantial possibility that [the juror] requested to be
discharged because he believed that the evidence offered at
trial was inadequate to support a conviction," the court deter-
mined that the defendant's Sixth Amendment rights had been
violated. *Id.*

We adopted *Brown* in 1999, in a case involving the prose-
cution of Arizona Governor Fife Symington III. During delib-
erations, the jury sent the court two notes requesting
guidance, because "[o]ne juror has stated their [*sic*] final opin-
ion prior to review of all counts," and the jury felt "that the
juror in question cannot properly participate in the discussion
with us" because she was unable to maintain focus on the top-
ics of discussion and she refused to discuss her views with the

other jurors. *Symington*, 195 F.3d at 1083. While being questioned individually, each juror confirmed the concerns raised in the notes, although "some jurors indicated that their frustration with [the juror] may have derived more from their disagreement with her on the merits of the case, or at least from their dissatisfaction with her defense of her views." *Id.* at 1084. The juror testified that she simply disagreed with the majority and she was willing to discuss the case with the other jurors, but that she had "bec[o]me intimidated" by the demands of the other jurors to justify her views. *Id.* The court dismissed the juror, on the ground that she was "either unwilling or unable to deliberate with her colleagues." *Id.*

**[3]** On appeal, we determined that "[w]hile there may have been some reason to doubt [the juror]'s abilities as a juror, there was also considerable evidence to suggest that the other jurors' frustrations with her derived primarily from the fact that she held a position opposite to theirs on the merits of the case." *Id.* at 1088. We therefore reversed, reasoning that "if the record evidence discloses any reasonable possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror." *Id.* at 1087 (emphasis omitted). We reached that conclusion because to allow dismissal under the circumstances presented would permit a court "[t]o remove a juror because he is unpersuaded by the Government's case," which would violate a defendant's rights.[16] *Id.* at 1085 (internal quotation

---

[16]A later AEDPA case, *Brewer v. Hall*, 378 F.3d 952 (9th Cir. 2004), which was decided long after Williams's conviction became final, characterized *Symington* as a decision under Federal Rule of Criminal Procedure 23(b), not the Sixth Amendment. Although we would not have reached the same conclusion as the Brewer court — *Symington* plainly adjudicated a Sixth Amendment challenge, *see* 195 F.3d at 1085 & n.2 — we are now bound by and therefore accept its description of *Symington*. Because we review the Sixth Amendment question presented here de novo, we may nevertheless treat *Symington* as instructive on the question of when it is constitutionally permissible to dismiss a juror mid-deliberations for reasons that could be merits-related. *Brewer* did not actually decide what the

marks omitted). We also acknowledged that a detailed inquiry into the jurors' thinking and motivations would "compromise the secrecy of jury deliberations" and "jeopardize the integrity of the deliberative process." *Id.* at 1086. We thus recognized that while a trial court's inability to resolve any ambiguity concerning alleged misconduct would result in the juror remaining empaneled, to do otherwise would, in the words of the Second Circuit, "destroy the jury system itself." *Thomas*, 116 F.3d at 623.

**[4]** Following *Brown*'s holding and *Symington*'s reasoning, we hold that the discharge of Juror No. 6 violated Williams's Sixth Amendment rights.[17] Even if we presume all the facts found by the state court to be correct, 28 U.S.C. § 2254(e)(1),

---

Sixth Amendment *does* require in cases of mid-deliberation juror discharge, since that case did not concern juror discharge, so the question remains open for us to answer even if *Symington* did not already answer it. *See* 378 F.3d at 955-956. Given that the D.C. Circuit's decision in *Brown*, upon which *Symington* relied and we rely, was indisputably a constitutional decision, we see no reason why the Sixth Amendment standard should be any different from the one announced in *Symington* for Rule 23. We therefore hold that, to comply with the Sixth Amendment, "if the record evidence discloses any reasonable possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror." *Symington*, 195 F.3d at 1087 (emphasis omitted).

[17]The Sixth Amendment protection required by *Brown* and foreshadowed by *Symington* is against improper interference with jury deliberations. Freedom to deliberate without coercion is a necessary component of "the interposition between the accused and his accuser of the common-sense judgment of a group of laymen," which is "the essential feature of a jury." *Williams*, 399 U.S. at 100. This component of the Sixth Amendment is thus incorporated with respect to the states through the Due Process Clause of the Fourteenth Amendment. In *Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999), for example, we held that improper coercion had broken a jury deadlock to produce the ten-to-two vote needed to convict under Oregon law, and granted habeas as a result. Similarly, the deadlock-breaking dismissal of a holdout juror on an improper basis is an unconstitutional form of interference with deliberations.

we conclude that the record discloses a "reasonable possibility that the impetus for [Juror No. 6's] dismissal stems from the juror's views on the merits of the case." 195 F.3d at 1087. At least seven jurors expressed the view that Juror No. 6 did not believe that the evidence was sufficient to prove guilt of murder beyond a reasonable doubt, thereby making a total of two-thirds of the panel. The jury foreman testified that Juror No. 6 "has probably ten or fifteen times in our conversation so far expressed that . . . he doesn't believe that there's sufficient evidence." Juror No. 2 said, "He didn't believe that whatever was in evidence was enough evidence for him." Juror No. 3 affirmed that Juror No. 6 "didn't believe that the evidence that was shown in trial was sufficient to prove the severe charge of murder." Juror No. 4 said, "Well, I guess he believes from the evidence that he's seen that there hasn't been sufficient proof." Juror No. 9 stated, "he didn't feel that there was enough proof of it [first degree murder]." Juror No. 10 said, "He didn't believe the evidence showed first degree murder should be the charge." And Juror No. 11 testified, "he said it [the evidence] wasn't proof beyond a reasonable doubt." The juror's views regarding the insufficiency of the evidence were thus made known to the prosecution as the result of a rigorous inquiry into the thought process and reasoning of Juror No. 6. Neither the trial court nor the Court of Appeal, however, even mentioned this clear evidence regarding the juror's views as to the merits, or acknowledged the strong possibility that Juror No. 6 was a holdout juror for legitimate reasons.

**[5]** As in *Brown*, "[g]iven the [reasonable] possibility" that the request to discharge the juror "stemmed from his belief that the evidence was inadequate to support a conviction, we must find that his dismissal violated" the defendant's Sixth Amendment right. 823 F.2d at 597. A comparison to the facts of *Symington* makes this violation all the more clear. In *Symington*, the evidence of juror misconduct was far greater than it was in the case before us, but even then we held that the juror's dismissal was improper given the "considerable evidence to suggest that the other jurors' frustrations with her

derived primarily from the fact that she held a position oppo-site to theirs on the merits of the case." *Symington*, 195 F.3d at 1088. The other jurors in that case were *unanimous* in their view that the discharged juror, a woman in her mid-70s, was both unable to participate in deliberations and unwilling to discuss her views. *Id.* at 1083. Here, the other jurors' views as to Juror No. 6's willingness to follow the law were mixed and the trial court ultimately did not find that he was unwill-ing to do so when deciding to discharge the juror; also, most of the jurors recalled Juror No. 6's many attempts to explain his views during deliberations, and *none* of the jurors expressed the view that Juror No. 6 was biased. There was, however, considerable frustration on the part of those other jurors that Juror No. 6 did not agree with them on the suffi-ciency of the evidence.

**[6]** As in *Symington*, notwithstanding the cause that the trial court believed it possessed to discharge the juror whom it knew to be the one vote for acquittal, it was not justified in *acting* upon that cause because there was a "reasonable possi-bility" that the request for removal was directly connected to the juror's views on the merits. Following *Brown* and *Syming-ton*, we could reverse on this basis alone.

## C

Although the reason offered above is sufficient to require granting the writ on the ground that Juror No. 6's discharge violated the Sixth Amendment, the trial court's lack of "good cause" for removing the known holdout juror provides an independent reason for reaching the same conclusion. *See Perez*, 119 F.3d at 1426. We therefore hold that, in addition to the *Symington* violation, the trial court's dismissal of Juror No. 6 was unconstitutional on its own terms.

**[7]** Although refusing to follow the law or refusing to deliberate would be "good cause" for discharging a juror, the trial court expressly disclaimed any finding that Juror No. 6

was guilty of either, and the Court of Appeal affirmed that determination.[18] The only good cause relied upon for dismissal of Juror No. 6 was "actual bias." The court did not find, however, that Juror No. 6 was "biased" in any traditional sense of the term, as would have been the case if, for example, he had stated that he could not be impartial or had accepted a bribe related to the case. Nor did it find that he had "implied bias," such as might have resulted from Juror No. 6 having a connection to one of the parties, or being related to someone who had either committed or been a victim of some similar crime. *Cf. Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring) (discussing possible instances of implied bias); *Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998) (en banc) (holding that a juror who was a victim of multiple crimes and whose husband had been a cellmate of the defendant should have been dismissed as biased).

Rather, the court found that the juror was "biased" for five overlapping reasons: (1) "the fact that he added his own words to the court's instructions as to what the law is," which "indicates where his mind is bent towards and that is biased against the prosecution in the matter"; (2) "his repeating of the severity of the charge in conjunction with his bringing up the subject of juror nullification," which "establishes his state of mind that he's bent in that regard, that he's concerned about the severity of the charge, which means the severity of the punishment"; (3) when the judge "asked him what burden of proof he was relying on, he said it was a [*sic*] very, very

---

[18]Specifically, the trial court said, "I'm going to dismiss the juror, but not because he's not deliberating and not because he's not following the law. . . . [I]t's fairly debatable whether he was deliberating or not, so I'm not taking that into account. That is not a basis for dismissal. Not following the law is not a basis for his dismissal either, since there was a request by him to have the law clarified. It was clarified for him." Rejecting Williams's argument that the standard for good-cause dismissals set forth in *Cleveland* had been violated, the Court of Appeal explained that Juror No. 6 was discharged "because he had shown himself to be biased, *not* because he was failing to deliberate or engaging in juror nullification."

convinced beyond a reasonable doubt," which the judge believed to mean "higher than beyond a reasonable doubt because the charge is murder"; (4) the fact that "[h]e also disagrees with the felony murder rule"; and (5) the fact that "[h]e's dishonest to me in stating that no juror including himself had discussed the severity of the charge, had not discussed juror nullification."

Whether that determination amounted to "bias" under the California standard for "actual bias" is neither a question that is before us nor a ground for federal habeas relief. What we must decide instead is whether the bases for discharge relied upon by the trial judge constitute, under the circumstances of this case, "good cause" for removing a known holdout juror. We conclude that they do not, for several reasons. Absent good cause, removal of the juror violated the Sixth Amendment.

**1**

[8] We begin with the trial court's determination that Juror No. 6 disagreed with the felony murder rule. Such "disagreement" with the type of crime charged is not the type of bias that can justify removing a juror for good cause mid-deliberations. There is no requirement that jurors *agree* with the law that they are asked to apply, so long as they agree to apply it impartially — which Juror No. 6 did here, according to the trial court. "The defendant's entitlement to jurors impartial on the question of whether he committed the crimes charged is entirely distinct from the question of whether the crime itself is one which arouses their moral passions"; a juror need not be "impartial to the underlying crime itself." *United States v. Johnson*, 990 F.2d 1129, 1133 (9th Cir. 1993). Indeed, even in the capital-punishment context, in which jurors must be specifically *qualified* for their task, impartiality requires only that "jurors . . . follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty"; as a result, dismissing jurors who merely har-

bor doubts about the death penalty is unconstitutional. *Adams v. Texas*, 448 U.S. 38, 45, 50 (1980).

We therefore hold that any disagreement with the law expressed by Juror No. 6, even if it constituted "bias" under California law, was not "good cause" for removing a deliberating juror, absent a finding that he was unwilling to follow the law due to his concerns about it. Indeed, it would be anomalous, as well as contrary to law, to hold that a juror was "biased" by his general feelings about a law if, as the trial court found here, he was neither unwilling nor unable to follow the law as required.

## 2

**[9]** Next, certain of the other trial court findings related to Juror No. 6's "concern" with the "severity of the charge," which the trial court erroneously took to mean that the juror was applying a higher-than-allowed burden of proof. But misstating the law during a mid-deliberation voir dire that should never have taken place cannot provide good cause to dismiss a juror, and the record does not support the finding that Juror No. 6 misstated the law in any event.

Juror No. 6 testified, when questioned by the court, "I can remember saying [during the jury deliberations] this is a very important case and we should be very convinced that if the defendant is found guilty that it is beyond a reasonable doubt." That sentiment is not "good cause" for the dismissal of a deliberating juror. First, the juror's statement should never have left the jury room. The court subjected Juror No. 6 to an improper and "broad-ranging judicial inquisition[ ] into [his] thought processes." *Thomas*, 116 F.3d at 623. The court asked, for example, "*In your own personal mind*, do you believe you are using a burden of proof that is based on a charge of first degree murder that is higher than one that would be used for some charge that is less serious than first degree murder?" and then presented Juror No. 6 with a string

of questions concerning jury deliberations in other, hypothetical prosecutions for other crimes. (Emphasis added). This pervasive inquiry violated the "imperative[ ] of preserving jury secrecy." *Symington*, 195 F.3d at 1087.

Second, the court clearly misstated what Juror No. 6 had testified to during the court's inquiry. The juror did not say "very, very convinced beyond a reasonable doubt" "when [the court] asked him what burden of proof he was relying on." His words were actually: "[W]e should be very convinced that if the defendant is found guilty that it is beyond a reasonable doubt." That is, as Juror No. 6 explained when pressed by the court, "very convinced" as used in his sentence — detached from the actual standard "beyond a reasonable doubt" — simply "means it's a good . . . idea to pay particular attention to what evidence was presented at the trial and make sure before we decide on a verdict, that . . . if the verdict is guilty, that we are convinced beyond a reasonable doubt by the evidence that was presented at the trial." The trial court's misstatement of the record made its conclusion unreasonable; Juror No. 6 did not "add[ ] his own words" to create a higher burden of proof when he answered the court's question. *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) (applying the more stringent AEDPA standard and explaining that "[a state court's] misapprehension [of the record] can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable").

Third, the court was wrong to derive meaning from the precise words used by the juror to define the government's burden of proof. The beyond-a-reasonable-doubt "standard is an ancient and honored aspect of our criminal justice system," but "it defies easy explication." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). In the context of evaluating jury instructions, the Court has emphasized that "[a]ttempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury," *Holland v. United States*, 348 U.S. 121, 140 (1954) (internal quotation marks omitted),

and that "[t]he rule may be, and often is, rendered obscure by attempts at definition, which serve to create doubts instead of removing them," *Hopt v. Utah*, 120 U.S. 430, 440-441 (1887). Similarly, the trial court's Socratic questioning of the juror regarding his understanding of the standard was unlikely to produce a clear and perfect response or reflect a precise unanimous understanding of the meaning of the words. Juror No. 6's statement was fully consistent with the jury instructions he had received. Moreover, despite the inquisition as to what standard the juror would actually apply, neither the trial court nor the Court of Appeal concluded that Juror No. 6 would not follow the law. In short, any purported deviation in Juror No. 6's understanding of those instructions did not give rise to good cause sufficient to justify removing a holdout juror.

Finally, it is hardly "bias" to acknowledge the relative "importan[ce]" of a murder trial and to "pay particular attention" to whether the evidence satisfies the required burden of proof. Rather, it is a realistic description of what all dedicated citizens who perform the public duty of serving on juries do: deliberate more intensively and consider the facts and law more thoroughly in the most serious of cases. Indeed, in *Adams* the Supreme Court expressly disapproved a *voir dire* inquiry that "exclude[d] jurors who stated that they would be 'affected' by the possibility of the death penalty, but who apparently meant only that the potentially lethal consequences of their decision would invest their deliberations with greater seriousness and gravity or would involve them emotionally." 448 U.S. at 49. So long as the jury actually applies the requisite burden of proof — which is the same for all crimes — in the end, it has acted appropriately, even if it undertook its task more deliberately and devoted more time to its deliberations before reaching its decision.

What resulted from the court's intrusive inquiry into the juror's reasoning was a suggestion that Juror No. 6 was paying "particular attention to what evidence was presented at the trial," was taking more time than others, and was not yet sure

whether the government had satisfied its burden of proof. That he was not convinced was not something that showed his bias, but rather a reflection of his current thinking regarding the issues in the case, a thought process to which the trial court should not even have been exposed.

### 3

**[10]** The remainder of the court's second determination — that Juror No. 6 was concerned with the severity of the *punishment*, as opposed to the seriousness of the *offense* charged — was contrary to the record and thus failed to amount to good cause for his dismissal. California courts, like the federal courts, prohibit juries from "discuss[ing] or consider[ing] the subject of penalty or punishment" in cases in which they have no sentencing responsibility, because the penalty that might result from a guilty verdict does not bear on the factual question of the defendant's guilt. CALJIC 17.42; *see Shannon v. United States*, 512 U.S. 573, 579 (1994). A juror's disregard for such an instruction may in some instances provide good cause to discharge him. But it is plain from the record that Juror No. 6 did not disregard the instruction here, and thus no good cause for his removal existed. *Cf. Taylor*, 366 F.3d at 1001.

According to the jury foreman, when he prepared his note to the trial court to report a juror who had "expressed concern relative to the severity of the charge," he originally wrote "severity of the punishment." He then erased "punishment" and replaced it with "charge," when "there seemed to be a consensus that that word ["punishment"] should be removed." Although the foreman "believe[d] that punishment is part of the issue in this other juror's mind," he did not say that Juror No. 6 had ever mentioned "punishment" and did not otherwise provide a basis for his belief. Indeed, only one juror, Juror No. 5, was even "pretty sure" he recalled the word "penalty" ever being used. When asked directly, none of the other jurors remembered the question of punishment or penalty

being raised. To the contrary, a number of them expressly denied that it had, distinguishing between the "charge" and the "penalty" or the "consequences," and explained that only the former had been mentioned.

Faced with this clear "consensus" among the jury and near unanimity, there could not have been good cause to dismiss Juror No. 6 for being "concerned about the severity of the charge, which means the severity of the punishment," because "they really are interchangeable." Rather, it is clear that the jurors understood the two to be distinct. As noted above, for a juror to say to his peers during deliberations that the case before them is an important one, involving serious *charges*, and that they should apply the beyond a reasonable doubt standard most carefully and deliberately, is not good cause for removal by any means.

**4**

**[11]** Finally, the trial court's determination that Juror No. 6 was "lying in court" about what had been discussed during deliberations is directly contradicted by the record. The transcript of Juror No. 6's testimony reveals that he never "stat[ed] that no juror *including himself* had discussed the severity of the charge," as the trial court found. (Emphasis added). To the contrary, when the trial judge recognized the ambiguity of the prosecutor's question, "Has anyone discussed the severity of the charge?" to which Juror No. 6 responded, "No, not that I recall," he then asked, "Just to be clear, have *you* made reference during deliberations to the severity of the charge?" (Emphasis added). Juror No. 6 then answered that, yes, *he* had talked about the importance of the case. Similarly, Juror No. 6 never "stat[ed] that no juror including himself had discussed . . . juror nullification." Again to the contrary, when asked by the prosecutor whether there was "any discussion about what the judge described as jury nullification," Juror No. 6 responded, "*Yes*, someone . . . raised the question whether juries always convict according to

the law, and I can remember I said sometimes they don't," and he then mentioned the historical examples of which he was aware. (Emphasis added).

The court's determination is contradicted not only by the record, but also by the court's earlier finding made immediately after Juror No. 6 testified. At that time, the court acknowledged that "actually, he sort of admitted that he had discussed [the severity of the charge]," and then concluded, "he *isn't* lying, but intentionally withheld honest information." (Emphasis added). Nothing in the record, however, indicated that Juror No. 6 had withheld anything, and the court offered no indication of what it thought the juror might have withheld.

We therefore conclude that the court's finding that Juror No. 6 was lying when he responded to the judicial inquiry in court was manifestly erroneous as well, and thus cannot provide good cause for his removal. In so holding, we recognize that credibility determinations fall largely within the purview of the factfinder and can rarely be reversed on direct appellate review, let alone on habeas. Nevertheless, this is not a case in which a credibility determination was based on intangible factors, such as demeanor, or on statements that are not inherently believable, or that conflict with other evidence. Rather, the trial court relied solely upon its recollection of statements made in court by the juror, which statements the juror in fact never made, as the transcript reveals. As "the state courts plainly . . . misstate[d] the record in making their findings," Williams is able to overcome the presumption of correctness bestowed upon them. *Taylor*, 366 F.3d at 1001.

**D**

**[12]** For the reasons stated above, none of the elements of the trial court's determinations, individually or collectively, regarding Juror No. 6 serve to establish the "good cause" required by the Sixth Amendment to remove a deliberating

juror, particularly one who was neither refusing to follow the law nor unwilling to deliberate. This is a separate reason, independent of the *Symington* violation, to hold that the dismissal of a known holdout juror was unconstitutional. What we are left with, then, are the conclusions (1) that *at least* a reasonable possibility existed that Juror No. 6's discharge stemmed from his disagreement with his peers over their views of the merits of the case, and (2) that there was no good cause to justify the juror's discharge.

Either conclusion standing alone would warrant reversal. Together, the constitutional violation is well beyond doubt. At most, the trial court inartfully identified some inchoate unease it felt about the juror, who was the only one not yet ready to vote to convict. Such unease, however, did not allow the court to discharge Juror No. 6, especially in light of the earlier disclosure of his views of the sufficiency of the evidence. The trial court's action deprived Williams of her constitutional right to a fair trial by jury.

## IV. CONCLUSION

A hung jury is never a desirable outcome in a criminal trial. When a mistrial results, the interest shared by the State, the defendant, the court, and the public in the efficient administration of justice is diminished. The sacrifice of efficiency for the preservation of liberty is central, however, to the safeguards the Constitution affords criminal defendants. If "[m]en must turn square corners when they deal with the Government," it is even more true that the government, including the courts, may not cut corners when dealing with man's freedom. *Rock Island, Ark. & La. R.R. v. United States*, 254 U.S. 141, 143 (1920). Unfortunately, the trial court cut some corners here. In view of the reasonable possibility that Juror No. 6's discharge was directly or indirectly the result of his position on the merits of the case, and in view of the lack of good cause to justify his dismissal, we hold that the removal of Juror No. 6 deprived Williams of her right to a fair trial by

jury. We therefore reverse the judgment of the district court and remand with instructions to grant the writ.

**REVERSED and REMANDED.**